**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| LILY DING, derivatively on behalf of AMTRUST FINANCIAL SERVICES, INC., | |
| Plaintiff, | C.A. No. _____ |
| vs. | |
| BARRY D. ZYSKIND, RONALD E. PIPOLY, JR., DONALD T. DECARLO, SUSAN C. FISCH, ABRAHAM GULKOWITZ, GEORGE KARFUNKEL, LEAH KARFUNKEL, and RAUL RIVERA, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| AMTRUST FINANCIAL SERVICES, INC., | |
| Nominal Defendant. | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**INTRODUCTION**

Plaintiff Lily Ding ("Plaintiff"), by her undersigned attorneys, derivatively and on behalf of Nominal Defendant AmTrust Financial Services, Inc. ("AmTrust" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Barry Zyskind, Ronald E. Pipoly, Jr., Donald T. Decarlo, Susan C. Fisch, Abraham Gulkowitz, George Karfunkel, Leah Karfunkel, and Raul Rivera (collectively, the "Individual Defendants" and together with AmTrust, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of AmTrust, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Section 14(A) of the Securities Exchange Act of 1934 (the

"Exchange Act").  As for her complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding AmTrust, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by AmTrust's directors and officers starting on February 29, 2016 and through the present (the "Relevant Period").

2.      AmTrust underwrites and provides property and casualty insurance in the United States and internationally through its subsidiaries.  The Company has three segments in which it operates: Specialty Risk and Extended Warranty, Small Commercial Business, and Specialty Program.  The Company distributes its policies using a network of wholesale and retail agents, and third-party brokers, agents, retailers, and administrators.

3.      During the Relevant Period, the Individual Defendants personally made and/or caused the Company to make a series of materially false and/or misleading statements regarding the Company's business, operations, prospects and legal compliance.  Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose that: (1) the

Company had ineffective assessment of the risks associated with its financial reporting; (2) the Company had an insufficient complement of corporate accounting and corporate financial reporting resources within the organization; (3) the Company did not appropriately recognize a portion of its warranty contract revenue; (4) the Company incorrectly expensed bonuses in the year paid rather than the year accrued; and (5) the Company lacked effective internal controls over financial reporting.  As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.  The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and/or misleading statements and/or omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

4.      On February 27, 2017, the Company issued a press release presenting fourth quarter and full year highlights for the fiscal year ended December 31, 2016 and revealing to the investing public that its annual report on Form 10-K would not be filed timely with the SEC.  In the press release, the Company disclosed that it would take an unexpected $65 million reserve charge and also revealed that it expected to disclose in its forthcoming Form 10-K that it "identified material weaknesses in its internal control over financial reporting . . . specifically related to ineffective assessment of the risks associated with the financial reporting, and an insufficient complement of corporate accounting and corporate financial reporting resources within the organization."  On February 24, 2017, the last trading day prior to the February 27, 2017 press release, the price per share of AmTrust stock at closing was $27.66.  The foregoing news caused the price per share of AmTrust stock to fall to $22.34, a drop of nearly 20%, at the close of trading on February 27, 2017.

5.     On March 16, 2017, the Company issued a press release announcing that its financial statements for 2014, 2015, and first three quarters of 2016 should be restated and should not be relied upon.  The Company further disclosed that "earnings and press releases and similar communications, to the extent that they related to the periods covered by these financial statements, as well as the Company's fourth quarter and fiscal 2016 earnings release dated February 27, 2017, should no longer be relied upon." Specifically, the Company revealed that its reporting errors "relate to: (1) upfront recognition of a portion of warranty contract revenue associated with administration services, based on the interpretation of ASC 605, Revenue Recognition, used in the previously filed financial statements related to multiple-element revenue recognition, instead of deferring recognition of the revenue over the life of the contract; and (2) bonuses that were expensed in the year paid but that should have been accrued in the year earned based on ASC 710, Compensation, and ASC 270, Interim Reporting."  On this news, AmTrust's share price fell again, this time by $4.03, or nearly 19%, from the previous day's closing price of $21.61 to close at $17.58 on March 17, 2017.

6.     On April 3, 2017, the Company filed its delayed Form 10-K for the fiscal year ending December 31, 2017 that restated the Company's financial statements for fiscal years ended December 31, 2014 and December 31, 2015. Among other things the Form 10-K reduced net income for fiscal year 2015 by 11.2%.

7.     On April 11, 2017, The Wall Street Journal revealed that an accountant at AmTrust's former accounting firm, BDO USA LLP, had worn a wire on behalf of the FBI and in cooperation with the SEC as a whistleblower and secretly recorded internal conversations in 2014 regarding AmTrust. The recordings were part of a continuing federal investigation into the company's accounting practices. A separate examination by the New York Department of

Financial Services, a leading state regulator, is also reportedly underway.   On this news, AmTrust stock fell further, by $3.57 per share, or about 19%, from the previous day's closing price of $18.87 to close at $15.30 per share on April 11.

8.      Due to the artificial inflation of the Company's stock price caused by the foregoing misrepresentations, which benefitted certain Individual Defendants who engaged in insider sales of Company stock, for the repurchases of the Company's own stock during the Relevant Period, which repurchases were caused by the Individual Defendants, the Company paid over $53.1 million more than the stock was worth.

9.      In light of the Individual Defendants' misconduct, which has subjected AmTrust -- as well as its Chairman and Chief Executive Officer ("CEO"), and its Executive Vice President and Chief Financial Officer ("CFO"), to being a defendant in three federal securities fraud class action lawsuits pending in the United States District Court for the Southern District of New York and the United States District Court for the Central District of California (the "Securities Class Actions"), to investigations by the FBI, SEC, and the New York Department of Financial Services, the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, including through overpayment for stock through repurchases, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, including through insider sales and related party transactions, the Company will have to expend many millions of dollars.

10.      In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the Chairman-CEO

and the Executive Vice President-CFO's liability in the Securities Class Actions, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of the Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and raise a federal question pertaining to the claims made in the federal securities class action based on violations of the Exchange Act.

12.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

13.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

14.     Venue is proper in this District because AmTrust is incorporated in this District. In addition, the Defendants have conducted business in this District, and Defendants actions have had an effect in this District.

## PARTIES

### Plaintiff

15.     Plaintiff is a current shareholder of AmTrust.  Plaintiff has continuously held AmTrust common stock since before the beginning of the Relevant Period.

### Nominal Defendant AmTrust

16.     AmTrust is a Delaware corporation with its principal executive offices at 59 Maiden Lane, 43rd Floor, New York, New York 10038.   AmTrust's shares trade on the NASDAQ under the ticker symbol "AFSI."

**Defendant Barry Zyskind**

17.     Defendant Barry D. Zyskind ("Zyskind") has served as a Company director since 1998 and currently serves as the Chairman of the Board.  He has served as the Company's CEO and President since 2000.  According to the Company's Schedule 14A filed with the SEC on March 29, 2016 (the "2016 Proxy Statement"), as of March 23, 2016, Defendant Zyskind beneficially owned about 37.2 million shares of the Company's common stock, which was about 21.3% of the Company's issued and outstanding common stock.  Given that the price per share of the Company's common stock at the close of trading on March 23, 2016 was $25.90, Zyskind owned over $965.6 million worth of AmTrust stock.

18.     For the fiscal year ended December 31, 2015, Defendant Zyskind received $13,942,205 in compensation from the Company.   This included $1,012,500 in salary, $3,000,015 in stock awards, $9,900,000 in non-equity incentive plan compensation, and $29,690 in other compensation.

19.     The Company acknowledged in the 2016 Proxy Statement that Defendant Zyskind is not an independent director under the NASDAQ listing rules.

20.     Defendant Zyskind is involved in at least twenty-one separate related-party transactions involving AmTrust and other entities he is affiliated with or owns in part, as outlined further herein.

21.     Per the Company's Schedule 14A filed with the SEC on April 11, 2017 (the "2017 Proxy Statement"), as of March 24, 2017, Defendant Zyskind beneficially owned about 44.88 million shares of the Company's common stock, which is about 26.2% of the Company's

issued and outstanding common stock. Proxy Statement, Defendant Zyskind is also part of a controlling group comprised of himself, Leah Karfunkel, and George Karfunkel that owns over 49% of the Company's voting power.  Of the 44.88 million shares he beneficially owns, over 15.50 million shares, or 9.06% of the Company's issued and outstanding common stock, are also beneficially owned by Leah Karfunkel.

22.     The Company's 2016 Proxy Statement stated the following about Defendant Zyskind:

> ***Barry D. Zyskind***,[1] 44, Director since 1998, has held senior management positions with the Company since 1998 and currently serves as our Chief Executive Officer and President. Mr. Zyskind also serves as an officer and director of many of our wholly-owned subsidiaries. Mr. Zyskind serves as non-executive chairman of the board of Maiden Holdings, Ltd., an insurance holding company (see "Certain Relationships and Related Transactions") and is a member of NGHC's board of directors. Prior to joining us, Mr. Zyskind was an investment banker at Janney Montgomery Scott, LLC in New York. Mr. Zyskind is Michael Karfunkel's son-in-law.
>
> Mr. Zyskind has been selected to serve on the Board of Directors because of his position as our Chief Executive Officer, his role in our profitable growth both before and after we became a public company, his knowledge of the industry and his experience in corporate finance. In addition, Mr. Zyskind, together with Michael Karfunkel and George Karfunkel, are our founding stockholders.

23.     Defendant Zyskind is the son-in-law of Defendant Leah Karfunkel.

**Defendant Pipoly**

24.     Defendant Ronald E. Pipoly, Jr. ("Pipoly") has served as the Company's Executive Vice President and Chief Financial Officer since 2005.  According to the 2016 Proxy Statement, as of March 23, 2016, Defendant Pipoly beneficially owned 591,313 shares of the Company's common stock.  Given that the price per share of the Company's common stock at

---

[1] Emphasis is in the original sources quoted throughout the Complaint.

the close of trading on March 23, 2016 was $25.90, Pipoly owned over $15.3 million worth of AmTrust stock.

25.      For the fiscal year ended December 31, 2015, Defendant Pipoly received $3,215,181 in compensation from the Company.  This included $705,769 in salary, a $100,000 bonus, $1,000,022 in stock awards, $1,400,000 in non-equity incentive plan compensation, and $9,390 in other compensation.

26.      During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Pipoly made the following sales (and made no purchases) of Company stock.   On March 4, 2016, Defendant Pipoly sold 4,000 shares of Company stock for $25.61 per share.  On April 4, 2016, Defendant Pipoly sold 4,000 shares of Company stock for $26.40 per share.  On January 3, 2017, Defendant Pipoly sold 4,000 shares of Company stock for $27.18 per share.   On February 3, 2017, Defendant Pipoly sold 4,000 shares of Company stock for $26.73 per share.   Thus, in total, before the fraud was exposed, Defendant Pipoly disposed of 16,000 Company shares on inside information, from which he received $423,680.   His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

27.      The 2016 Proxy Statement stated the following about Defendant Pipoly:

> **Ronald E. Pipoly, Jr.** joined the Company in 2001 and has been Chief Financial Officer since 2005. From 1993 to 2001, Mr. Pipoly served as Financial Analyst, Assistant Controller, and ultimately Controller at PRS Group, Inc., a property and casualty insurance holding company in Beachwood, Ohio. Mr. Pipoly began his career at Coopers and Lybrand, an accounting firm, where he worked from 1988 through 1993.

**Defendant L. Karfunkel**

28.     Defendant Leah Karfunkel ("L. Karfunkel") has served as a Company director since May 2016.  According to the 2016 Proxy Statement, as of March 23, 2016, Defendant L. Karfunkel beneficially owned 20,059,274 shares of the Company's common stock, which was about 11.4% of the Company's issued and outstanding common stock.  Given that the price per share of the Company's common stock at the close of trading on March 23, 2016 was $25.90, L. Karfunkel owned over $519.5 million worth of AmTrust stock.

29.     The Company also disclosed in the 2016 Proxy Statement that Defendant L. Karfunkel is not considered an independent director under the NASDAQ listing rules.

30.     Defendant L. Karfunkel is involved in at least twenty-one separate related-party transactions involving AmTrust and other entities she is affiliated with or owns in part, as outlined further herein.

31.     Per the 2017 Proxy Statement, as of March 24, 2017, Defendant L. Karfunkel beneficially owned over 22.25 million shares of the Company's common stock, which is about 13.0% of the Company's issued and outstanding common stock.  Defendant L. Karfunkel is part of the controlling group comprised of herself, Zyskind, and George Karfunkel that owns over 49% of the Company's voting power. Of the 22.25 million shares she beneficially owns, over 15.50 million shares, or 9.06% of the Company's issued and outstanding common stock, are also beneficially owned by Zyskind.

32.     The Company's Form 8-K filed with the SEC on May 19, 2016 stated the following about Defendant L. Karfunkel:

> Mrs. Karfunkel is the cotrustee and primary beneficiary of The Michael Karfunkel 2005 Family Trust (the "Trust"), one of the Company's largest stockholders. She has served in various positions for community and charitable organizations, and is currently on the Board of Trustees of Touro College. The Trust owns ACP Re, Ltd., a privately-held Bermuda reinsurance holding company, is a controlling stockholder of National

General Holdings Corp., a publicly-held specialty personal lines insurance holding company, and a significant stockholder of Maiden Holdings, Ltd., a publicly-held Bermuda insurance holding company. The Company is a party to several material agreements with each of ACP Re, Ltd., National General Holdings Corp. and Maiden Holdings, Ltd., as described in Note 12. "Related Party Transactions" to the Company's consolidated financial statements included in its Quarterly Report on Form 10-Q for the quarter ended March 31, 2016. Mrs. Karfunkel is the mother-in-law of Barry Zyskind, the Company's President and Chief Executive Officer, and the sister-in-law of George Karfunkel, a member of the Company's Board of Directors.

33.     Defendant L. Karfunkel is the mother-in-law of Defendant Zyskind and the sister-in-law of Defendant George Karfunkel.

**Defendant G. Karfunkel**

34.     Defendant George Karfunkel ("G. Karfunkel") has served as a Company director since 1998.  According to the 2016 Proxy Statement, as of March 23, 2016, Defendant G. Karfunkel beneficially owned 32,438,408 shares of the Company's common stock, which was about 18.5% of the Company's issued and outstanding common stock. Given that the price per share of the Company's common stock at the close of trading on March 23, 2016 was $25.90, G. Karfunkel owned over $840.1 million worth of AmTrust stock.

35.     The Company also disclosed in the 2016 Proxy Statement that Defendant G. Karfunkel is not considered an independent director under the NASDAQ listing rules.

36.     Defendant G. Karfunkel is involved in at least seven separate related-party transactions involving AmTrust and other entities he is affiliated with or owns in part, as outlined further herein.

37.     Per the 2017 Proxy Statement, as of March 24, 2017, Defendant G. Karfunkel beneficially owned about 32.44 million shares of the Company's common stock, which is about 19.0% of the Company's issued and outstanding common stock. Defendant G. Karfunkel is part

of the controlling group comprised of himself, Zyskind, and L. Karfunkel that owns over 49% of the Company's voting power.

38.     The Company's 2016 Proxy Statement stated the following about Defendant G. Karfunkel:

> ***George Karfunkel***, 67, Director since 1998, is currently the Chairman of Sabr Group, a consulting company based in New York City. Mr. Karfunkel was a director, the former Senior Vice President and co-owner of American Stock Transfer & Trust Company, LLC, a stock transfer company, which he founded in 1971 with his brother, Michael Karfunkel, and sold in 2008. Mr. Karfunkel's real estate holdings include major office buildings in New York, Chicago and several other cities, which he holds through entities he controls with Michael Karfunkel. The Karfunkels also are co-owners of Worldwide TechServices, LLC, a computer maintenance and services company. Mr. Karfunkel serves as vice chairman of The Upstate Bank, a nationally-chartered community bank, co-chairman of CheckAlt Payment Solutions, a provider of automated and electronic check transaction processing, a director of The Berkshire Bank, an independent bank based in New York, and a director of Eastman Kodak Company, a technology company focused on imaging for business.
>
> Mr. Karfunkel has been selected to serve on the Board of Directors because he is a successful businessman with 45 years of experience in the ownership and management of and investment in the financial services industry, including insurance, banking and real estate. In addition, Mr. Karfunkel, together with Michael Karfunkel and Mr. Zyskind, are our founding stockholders.

**Defendant Rivera**

39.     Defendant Raul Rivera ("Rivera") has served as a Company director since August 2016.

40.     The 2016 Proxy Statement states that "[e]ffective January 1, 2016, [the Company] will . . . pay an annual retainer of $100,000 to each of our non-employee directors other than George Karfunkel and Michael Karfunkel."

41.     The Company's Form 8-K filed with the SEC on August 4, 2016 stated the following about Defendant Rivera:

> Mr. Rivera, age 73, is the Chairman, President and Chief Executive Officer of National Benefit Life Insurance Company, a position he has held since 2001. Mr. Rivera is also currently a board member of Life Insurance Council of New York, Inc., Insurance Federation of New York, Inc., Life Insurance Company Guaranty Corporation of New York and one of AmTrust's subsidiaries. In addition, Mr. Rivera is a member of the National Association of Insurance and Financial Advisors and a trustee of the College of Mount Saint Vincent in Riverdale, New York.

**Defendant Gulkowitz**

42.     Defendant Abraham Gulkowitz ("Gulkowitz") has served as a Company director since 2006.  He is the Chair of the Audit Committee and a member of the Nominating and Corporate Governance Committee.  According to the 2016 Proxy Statement, as of March 23, 2016, Defendant Gulkowitz beneficially owned about 110,604 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 23, 2016 was $25.90, Gulkowitz owned over $2.86 million worth of AmTrust stock.

43.     For the fiscal year ended December 31, 2015, Defendant Gulkowitz received $140,006 in compensation from the Company.  This included $110,000 in fees earned or cash paid and $30,006 in stock awards.

44.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Gulkowitz sold 15,126 shares of Company stock for $27.70 per share on December 20, 2016.  Thus, before the fraud was exposed, Defendant Gulkowitz disposed of 15,126 Company shares on inside information, from which he received over $418,990.  His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

45.     The Company's 2016 Proxy Statement stated the following about Defendant Gulkowitz:

> **_Abraham Gulkowitz_**, 67, Director since 2006, is a co-founder and partner of Brookville Advisory, an investment fund specializing in credit analysis whose predecessor is Brookville Capital, which was started in 2002 and in late 2006 was sold to Morgan Stanley Alternative Assets. Mr. Gulkowitz worked for Brookville Capital from 2002 until Brookville Advisory became independent in 2011. From 1978 to 2002, Mr. Gulkowitz served in various positions, including as a Senior Managing Director and a member of the partners' management group, at Bankers Trust/Deutsche Bank, an investment bank. His responsibilities included the analysis of economic and business issues related to leveraged financing transactions as well as mergers and acquisitions, private equity and real estate investments. Mr. Gulkowitz joined Bankers Trust in 1978 from Chase Manhattan Bank where he was a financial market analyst. Prior to that, he was an economics research assistant to Alan Greenspan. Mr. Gulkowitz is also a member of the advisory board of Gryphon Investors Group, a San Francisco-based private equity firm specializing in middle market investment opportunities.
>
> Mr. Gulkowitz has been selected to serve on the Board of Directors because of his diverse and extensive financial and management experience and because he qualifies as our Audit Committee financial expert.

**Defendant Fisch**

46.     Defendant Susan C. Fisch ("Fisch") has served as a Company director since 2010. Defendant Fisch is a member of the Audit Committee, the Compensation Committee, and the Nominating and Corporate Governance Committee.  According to the 2016 Proxy Statement, as of March 23, 2016, Defendant Fisch beneficially owned about 70,400 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 23, 2016 was $25.90, Fisch owned over $1.8 million worth of AmTrust stock.

47.     For the fiscal year ended December 31, 2015, Defendant Fisch received $130,006 in compensation from the Company.  This included $100,000 in fees earned or cash paid and $30,006 in stock awards.

48.     The Company's 2016 Proxy Statement stated the following about Defendant Fisch:

> **Susan C. Fisch**, 71, Director since 2010, has over 30 years of experience in the insurance industry as a reinsurance broker specializing in workers' compensation. From 2001 to 2009, Ms. Fisch was an executive at Willis Re, Inc., an insurance broker, where she created and directed the Workers' Compensation Practice Group that was responsible for the creation of new products, placement of workers' compensation programs, relationship coordination with reinsurers and new client prospecting. In addition, she provided guidance and strategic direction to Willis Re clients and prospects in all aspects of workers' compensation. From 1992 through 2001, Ms. Fisch was a senior vice president and team leader specializing in workers' compensation at Benfield Blanch. From 1987 through 1992, she was a reinsurance treaty broker focusing on workers' compensation at Enan & Company. From 1978 through 1987, she was employed by Thomas A. Greene Company as a facultative broker and, ultimately, as head of the casualty facultative department in the company's San Francisco office. She began her career with Towers Perrin, an actuarial company, in 1976. Ms. Fisch has been a frequent speaker at workers' compensation seminars.
>
> Ms. Fisch has been selected to serve on the Board of Directors because of her extensive knowledge of and contacts in the industry, with a specialization in workers' compensation insurance.

**Defendant DeCarlo**

49.     Defendant Donald T. DeCarlo ("DeCarlo") has served as a director of AmTrust since 2006.  He is the Chair of the Nominating and Corporate Governance Committee, the Chair of the Compensation Committee, and a member of the Audit Committee.  According to the 2016 Proxy Statement, as of March 23, 2016, Defendant DeCarlo beneficially owned about 132,878 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 23, 2016 was $25.90, DeCarlo owned over $3.4 million worth of AmTrust stock.

50.     For the fiscal year ended December 31, 2015, Defendant DeCarlo received $258,339 in compensation from the Company.  This included $228,333 in fees earned or cash paid and $30,006 in stock awards.

51.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant DeCarlo made the following sales (and made no purchases) of Company stock.  On September 15, 2016, Defendant DeCarlo sold 2,200 shares of Company stock for $26.53 per share.   On October 3, 2016, Defendant DeCarlo sold 3,114 shares of Company stock for $26.19 per share.  On November 1, 2016, Defendant DeCarlo sold 3,200 shares of Company stock for $25.89 per share.   On December 1, 2016, Defendant DeCarlo sold 3,420 shares of Company stock for $25.75 per share.  On January 3, 2017, Defendant DeCarlo sold 4,620 shares of Company stock for $27.19 per share.  On February 1, 2017, Defendant DeCarlo sold 4,830 shares of Company stock for $26.67 per share.   Thus, in total, before the fraud was exposed, Defendant DeCarlo sold 21,384 Company shares on inside information, for which he received over $565,267.  His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

52.     The Company's 2016 Proxy Statement stated the following about Defendant DeCarlo:

> **Donald T. DeCarlo**, 77, Director since 2006, is an attorney in private practice. Mr. DeCarlo served as the Chairman of the Board of Commissioners of the New York State Insurance Fund from 2011 until October 2012 and served as a Commissioner from 1997 through 2009. From 1996 to 2004, Mr. DeCarlo practiced in the New York offices of Lord, Bissell & Brook, LLP, a law firm, where he was managing partner prior to his departure. He is a director of Jackson National Life Insurance Co. of New York, Greater New York Mutual Insurance Company (an insurer that primarily underwrites large property coverages) and its subsidiaries, Greater New York Custom Insurance Company, Insurance

Company of Greater New York and Strathmore Insurance Company, WRM America Indemnity Company Inc. and several of our subsidiaries. He is also a member of National General Holdings Corp.'s Board of Directors. From 1987 to 1997, Mr. DeCarlo held a number of positions with the Travelers Group's insurance companies, including serving as Senior Vice President and General Counsel of all of the companies from 1994 to 1997. From 1973 to 1986, Mr. DeCarlo was vice president and general counsel of the National Council on Compensation Insurance, a national association that collects, tabulates and provides data used in formulating rates for workers compensation insurance. Mr. DeCarlo has written three books and numerous articles on workers' compensation insurance.

Mr. DeCarlo has been selected to serve on the Board of Directors because he is a recognized expert in the workers' compensation industry. He has extensive experience representing insurance industry clients in corporate, regulatory and commercial matters.

## NON-PARTY MICHAEL KARFUNKEL AND RELATED PARTY-TRANSACTIONS

### Michael Karfunkel

53.     Michael Karfunkel ("M. Karfunkel") served as Chairman of the Board from 1998 until his death in April 2016.  According to the 2016 Proxy Statement, as of March 23, 2016, M. Karfunkel beneficially owned about 2,192,824 shares of the Company's common stock, which was about 1.3% of the Company's issued and outstanding common stock.  Given that the price per share of the Company's common stock at the close of trading on March 23, 2016 was $25.90, M. Karfunkel owned over $56.7 million worth of AmTrust stock.

54.     The Company also disclosed in the 2016 Proxy Statement that M. Karfunkel was not considered an independent director under the NASDAQ listing rules.

55.     During the Relevant Period, and before his death, M. Karfunkel was involved in at least thirteen separate related-party transactions involving AmTrust and other entities he was affiliated with or owned in part, as outlined further herein.

56.     Per the 2016 Proxy Statement, M. Karfunkel was also part of the controlling shareholder group.  He was the husband of Defendant L. Karfunkel, brother to Defendant G. Karfunkel, and father-in-law to Defendant Zyskind.

57.     The Company's 2016 Proxy Statement stated the following about M. Karfunkel:

> **Michael Karfunkel**, 73, Chairman of the Board of Directors since 1998, is a businessman with significant interests in the financial services industry, including insurance, banking and real estate. He is currently Chairman, President and Chief Executive Officer of National General Holdings Corp. ("NGHC"), an insurance holding company. He has held this position since NGHC was formed in 2009 (see "Certain Relationships and Related Transactions"). Mr. Karfunkel serves on the Board of Trustees for New York Medical College, and his real estate holdings include major office buildings in New York, Chicago and several other cities, which he holds through entities he controls with his brother, George Karfunkel. The Karfunkels also are co-owners of Worldwide TechServices, LLC, a computer maintenance and services company. Mr. Karfunkel was a director, the former President and co-owner, with George Karfunkel, of American Stock Transfer & Trust Company, LLC, a stock transfer company, which he founded in 1971 with George Karfunkel, and sold in 2008. Mr. Karfunkel is Mr. Zyskind's father-in-law.
>
> Mr. Karfunkel has been selected to serve on the Board of Directors because he has a 45 year record of developing and managing successful businesses, including the Company, Maiden Holdings, Ltd. and NGHC. His experience includes the management of large investment portfolios, mergers and acquisitions, and corporate finance, all of which are integral to our success. In addition, Mr. Karfunkel, together with George Karfunkel and Mr. Zyskind, are our founding stockholders.

**The Michael Karfunkel Family 2005 Trust**

58.     The Michael Karfunkel Family 2005 Trust (the "Trust") holds 15,504,562 shares of the Company's common stock, which represents approximately 9.06% of the Company's total common stock.  The shares held by the Trust are beneficially owned by Defendants L. Karfunkel and Zyskind.  The co-trustees of the Trust are Defendants Zyskind and L. Karfunkel.  The ultimate beneficiaries of the Trust include M. Karfunkel's children, one of whom is married to Defendant Zyskind.

59.     The Trust is involved in several related-party transactions concerning AmTrust, as outlined below.

**ACP Re, Ltd.**

60.     The Trust owns ACP Re, Ltd. ("ACP"), a privately-held Bermuda reinsurance holding company that operates 10 insurance companies in Bermuda and the U.S.

61.     Defendants Zyskind and L. Karfunkel are thus involved and interested in any related-party transactions involving the Company and ACP.  Such transactions include:

Asset Management Agreement

An AmTrust subsidiary provides ACP and certain of its subsidiaries with asset management services at an annual rate of 0.20% of the average value of the invested assets under management, excluding investments in the Company's stock, for the preceding calendar quarter if the average value of invested assets under management for the quarter is $1 billion or less.  If the average value of such assets for the preceding calendar quarter is greater than $1 billion, the annual rate is 0.15% of the average value of invested assets under management, excluding investments in the Company's stock.   For the fiscal year ended December 31, 2016, AmTrust recorded approximately $1.6 million for the services provided to ACP and its subsidiaries.

Commercial Lines Master Agreement

AmTrust and ACP are parties to an Amended and Restated Commercial Lines Master Agreement which provides for various transactions that are to be implemented as a result of a merger between ACP and Tower Group International, Ltd ("Tower").  Per the agreement, AmTrust and National General Holdings Corp. ("NGHC") must pay ACP contingent consideration in the form of a three year earn-out, payable semi-annually, of 3% of gross written

premium of Tower's commercial lines business written or assumed by AmTrust as a result of the merger.

62.     Additionally, AmTrust entered into at least six more related-party transactions involving or relating to ACP , which are referenced on pages 48-51 of the 2016 Proxy Statement, and incorporated by reference herein.

### National General Holdings Corp.

63.     AmTrust has an approximately 12% ownership interest in NGHC.  NGHC is a publicly-held specialty personal lines insurance holding company that provides a variety of insurance products, including homeowners, umbrella, personal and commercial automobile.  The two largest shareholders of NGHC are the Trust and a grantor retained annuity trust controlled by L. Karfunkel.

64.     Defendants Zyskind and L. Karfunkel are thus involved and interested in any related-party transactions involving the Company and NGHC.  Such transactions include:

Master Services Agreement

AmTrust provides NGHC and its affiliates information technology services in connection with the development and licensing of a policy management system and printing and mailing services associated with the policies the Company processes for NGHC and its affiliates on the policy management system.  The Company recorded approximately $35.9 million of fee income for the fiscal year ended December 31, 2015 as a result of this agreement with NGHC.

Asset Management Agreement

For an annual fee, one of AmTrust's subsidiaries manages the assets of certain of NGHC's subsidiaries, including the assets of reciprocal insurers managed by subsidiaries of NGHC.  Pursuant to this agreement, the annual fee is equal to either 0.20% or 0.15% of the

average aggregate value of the assets under management for the preceding quarter.   If the average aggregate value for the preceding quarter is $1.0 billion or less, the annual fee is 0.20%. If the average aggregate value for the preceding quarter is more than $1.0 billion, the annual fee is 0.15%.   As a result of this agreement, AmTrust earned approximately $2.7 million of asset management fees for the fiscal year ended December 31, 2015.

65.     Additionally, there are at least five more related-party transactions involving NGHC and AmTrust, which are referenced on pages 46-47 and 51 of the 2016 Proxy Statement, and incorporated by reference herein.

### Maiden Holdings, Ltd.

66.     Maiden Holdings, Ltd. ("Maiden"), is a publicly-held Bermuda insurance holding company that has various reinsurance and service agreements with AmTrust.   Maiden was formed by M. Karfunkel and Defendants G. Karfunkel, and Zyskind.   As of December 31, 2015, Defendant G. Karfunkel owned or controlled approximately 4.4% of the issued and outstanding capital stock of Maiden.   As of December 31, 2016, Defendants L. Karfunkel and Zyskind owned or controlled approximately 7.9% and 7.5%, respectively, of the issued and outstanding capital stock of Maiden.   Defendant Zyskind serves as chairman of Maiden's board of directors.

67.     Defendants Zyskind, L. Karfunkel, and G. Karfunkel are thus involved and interested in any related-party transactions involving the Company and Maiden.   Such transactions include:

### Reinsurance Agreements with Maiden

AmTrust and Maiden entered into a master agreement in 2007 in which the parties caused AmTrust International Insurance, Ltd. ("AII"), AmTrust's Bermuda subsidiary, and Maiden Reinsurance Ltd ("Maiden Reinsurance"), Maiden's wholly-owned Bermuda subsidiary, to enter

into a quota share reinsurance agreement where AII retrocedes an amount equal to 40% of the premium written for certain lines of business by AmTrust's U.S., Irish and U.K. insurance companies, net the cost of unaffiliated inuring reinsurance to Maiden Reinsurance.  Pursuant to the master agreement, AII receives a ceding commission of 31% of ceded written premiums with respect to all ceded business as specified by the agreement.  The quota share reinsurance agreement outlined in the master agreement was renewed through June 2019 and will automatically renew for successive three-year terms, subject to termination by notice by AII or Maiden Reinsurance.  For the fiscal year ended December 31, 2015, the parties commuted certain business that had been ceded under the quota share reinsurance agreement in the aggregate amount of $93.7 million.

### European Quota Share

Through two of its subsidiaries, AmTrust entered into a reinsurance agreement with Maiden Reinsurance by which the Company cedes to Maiden Reinsurance 40% of its European medical liability business.  The agreement was renewed through March 21, 2017 and automatically renews every year, subject to termination by notice by either party.  For the fiscal year ended December 31, 2015, AmTrust recorded approximately $4.1 million of ceding commission under the agreement.

68.    Additionally, there are at least four more related-party transactions involving Maiden and AmTrust, which are referenced on pages 45-46 and 51 of the 2016 Proxy Statement, and incorporated by reference herein.

### Other Related Parties

69.    AmTrust and certain other parties referenced on pages 50-51 of the 2016 Proxy Statement, which is incorporated by reference herein are involved in related-party transactions

concerning the leasing of corporate office space, equity investments in limited partnerships, and the use of Company aircraft.  Some of these parties include Defendant G. Karfunkel, Defendant Zyskind, ACP, NGHC, and Maiden.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

70.     By reason of their positions as officers, directors, and/or fiduciaries of AmTrust and because of their ability to control the business and corporate affairs of AmTrust, the Individual Defendants owed AmTrust and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage AmTrust in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of AmTrust and its shareholders so as to benefit all shareholders equally.

71.     Each director and officer of the Company owes to AmTrust and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

72.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of AmTrust, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

73.     To discharge their duties, the officers and directors of AmTrust were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

74.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The

conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of AmTrust, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised AmTrust's Board at all relevant times.

75.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's lack of effective internal controls, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

76.     To discharge their duties, the officers and directors of AmTrust were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of AmTrust were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and

pursuant to AmTrust's own Code of Business Conduct and Ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how AmTrust conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of AmTrust and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that AmTrust's operations would comply with all applicable laws and AmTrust's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and

accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

77.     Each of the Individual Defendants further owed to AmTrust and the shareholders the duty of loyalty requiring that each favor AmTrust's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

78.     At all times relevant hereto, the Individual Defendants were the agents of each other and of AmTrust and were at all times acting within the course and scope of such agency.

79.     Because of their advisory, executive, managerial, and directorial positions with AmTrust, each of the Individual Defendants had access to adverse, non-public information about the Company.

80.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by AmTrust.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

81.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

82.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Section 14(a) of the

Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price while the Company repurchased its own stock and certain Individual Defendants engaged in lucrative insider sales.

83.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of AmTrust was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

84.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

85.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of AmTrust, and was at all times acting within the course and scope of such agency.

## AMTRUST'S CODE OF BUSINESS CONDUCT AND ETHICS

86.     The Company's Code of Business Conduct and Ethics (the "Code of Ethics")

"applies to all AmTrust employees, officers, directors and contractors" and "sets out the values

and principles to guide all employees, directors and officers."

87.     The Code of Ethics provides, as to "Complying with Applicable Laws," that:

> Our operations reach around the globe and laws may vary greatly from
> one country to the next. We must understand and follow the laws and
> regulations that apply to us and our operations at all times, regardless of
> where we are located. If you ever have questions about local laws or find
> that local laws conflict with the Code, you should seek guidance from the
> Legal Department.

88.     The Code of Ethics provides, as to "Seeking Guidance and Reporting Concerns,"

that:

> By sharing our questions and concerns, we uphold the Company's
> commitment to integrity, honesty and ethical business practices.   In
> addition, we contribute to our shared ethical culture and, by speaking up,
> we can improve the way in which we conduct our business.  If you wish to
> raise a question or concern, you are encouraged to:
>
> - Speak with a supervisor or manager
> - Consult the Legal or Compliance Departments
> - Discuss the issue with appropriate department representatives
> - File a report by email through our confidential hotline at
>   www.openboard.info/afsi
> - Call our Hotline
> - Contact Global Compliance at globalcompliance@amtrustgroup.com

89.     The Code of Ethics provides, as to "Maintaining Accurate Books and Records,"

that:

> We are required to maintain accurate books and records in accordance
> with the securities and accounting laws of the U.S. the countries in which
> our subsidiaries are incorporated, as well as the countries in which we
> operate. These documents form the basis of our earning statements,
> financial reports and other public disclosures and should be maintained
> accurately, completely and in a timely and understandable manner. In
> addition, they guide our Company's business actions and decisions. Each

of us is responsible for keeping accurate records of transactions, time reports, expense accounts and other financial records. In addition, we must comply with AmTrust's system of internal controls for financial reporting.

We may never make a false representation in our Company's books or otherwise mischaracterize such information. This means we cannot:

- Intentionally distort or disguise the true nature of a transaction in any accounting entries
- Make a representation, whether in a document or verbally, that is not fully accurate
- Establish any undisclosed or unrecorded funds or assets, such as "slush funds," for any purpose

You must submit any concerns or complaints regarding accounting, internal accounting controls or auditing matters. You can do so anonymously or confidentially via the hotline or contact any resource listed in "Seeking Guidance and Reporting Concerns."

If you have any questions about this section of the Code, you should consult the Legal Department.

90.     The Code of Ethics provides, as to "Records Management," that:

We have a responsibility to understand and follow applicable statutory, regulatory and contractual requirements governing how long we should retain Company documents, as well as how and when to discard them. You therefore must understand and follow the guidelines set forth in the Records Management Retainer Schedule before destroying any Company documents. If you are unsure whether you should maintain or destroy a particular document, you should consult your supervisor.

You may be notified that documents in your control may be relevant to a lawsuit or government investigation. If you receive this type of notice, you must preserve (and never alter, conceal or destroy) any documents identified in the notification that may be relevant. Questions about such preservation notices should be directed to the individual who issued the notice. If you are unsure of whether a document is relevant, contact the Legal Department.

In addition, never assist or encourage anyone to destroy records in connection with an audit or review.

91.     The Code of Ethics provides, as to "Conflicts of Interest," that:

*Avoiding Conflicts of Interest*

To create sustainable shareholder value, we must ensure that all of our business actions and decisions are in our Company's best interest. We therefore must be careful to avoid any actual or potential conflict of interest. A "conflict of interest" arises when our personal interests interfere with the interests of our Company. If you feel you are in a situation that might give rise to an actual or potential conflict of interest with AmTrust, you must disclose the situation immediately to your manager or the Legal Department. Promptly disclosing any personal interest in, or association with, any business decision that might directly or indirectly confer a benefit to us or any immediate family member will help to remedy these potential situations. Remember, while having a conflict of interest is not necessarily a violation of our Code, failing to disclose it is.

\*\*\*

*Outside Employment and Financial Interests*

At no time may we hold any outside employment that interferes with our Company's best interests. This means that we may not:

- Accept outside work that in any way limits our ability to perform our job duties for AmTrust
- Engage in business activities involving firms that compete with, sell to or buy from our Company
- Use AmTrust facilities, equipment or other property in the pursuit of such activities

In addition, we should not own substantial financial interests in companies that do business or compete with our Company. We may own stock in any entity whose securities are regularly traded on a recognized stock exchange, even when a firm is in some way competitive with our Company. However, our investment may not be of such a size that it could influence our judgment on Company matters.

92.    The Code of Ethics provides, as to "Insider Trading," that:

*Avoiding Insider Trading*

Through our work, we may learn material, non-public information (or "inside" information) about our Company or another company with which we do business. "Material information" is any information that a reasonable investor would consider important in making a decision to trade in a company's securities. Information is material even if it relates to future, speculative or contingent events. It may also be material even if it is only significant when viewed in light of publicly available information. Information is "non-public" unless it has been provided to the public and

adequate time has passed for the markets to digest the information. When we have inside information about a company, we may not trade the securities of that company. This illegal activity is called "insider trading. Through our work, we may acquire inside information about AmTrust, as well as other companies whose 29 business relates to ours. Insider trading laws govern trades based on all such information.

Communicating inside information to another person that would help them make a profit or prevent a loss (called "tipping") is also a violation of insider trading laws. Be advised that, in this situation, you expose yourself and the Company to liability for breaking insider trading laws. Penalties for violations of insider trading laws are severe for both the individuals involved and our Company. For questions related to insider trading, please see the Insider Trading and Outside Investment Policy. If you have any questions about whether you possess inside information or whether you can trade in a company's securities, you should consult the Legal Department before taking any action.

93.     The Code of Ethics provides, as to "Communication with the Public," that:

Our reputation for integrity is an intangible Company asset that ensures our future success. We must protect this asset by making sure the Company's public communications give an honest and consistent picture of our operations. We therefore must properly handle outside inquiries. Only those persons who are authorized to speak on the behalf of AmTrust may make public comments on behalf of the Company. If you receive a request for information from investors, security analysts or the media do not respond, and instead forward it to Investor Relations or the Legal Department. All calls from the media must be directed to Corporate Communications.

94.     In violation of the Code of Ethics, the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' schemes, including the scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of Section 14(A) of the Exchange Act.  In violation of the Code of Ethics, the Individual Defendants consciously disregarded their duties to (1) comply

with the Code of Ethics and applicable laws and regulations, (2) avoid conflicts of interest, (3) act in the Company's best interests, (4) protect corporate assets, (5) appropriately maintain the Company's books, records, accounts, and financial statements, (6) disseminate accurate and complete information to shareholders and the public, (7) report violations of the Code of Ethics, and (8) make accurate filings with the SEC.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Materially False and Misleading Statements Issued During the Relevant Period

95.     On February 29, 2016, the Company filed its annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2015 (the "2015 10-K"), which was signed by Defendants Zyskind, Pipoly, Karfunkel, Karfunkel, DeCarlo, Fisch and Gulkowitz.

96.     The statements made in the 2015 10-K were false and misleading and failed to disclose that (1) the Company had ineffective assessment of the risks associated with its financial reporting; (2) the Company had an insufficient complement of corporate accounting and corporate financial reporting resources within the organization; (3) the Company did not appropriately recognize a portion of its warranty contract revenue; (4) the Company incorrectly expensed bonuses in the year paid rather than the year accrued; and (5) the Company lacked effective internal controls over financial reporting.   Additionally, the statements falsely noted that the Company's disclosure controls and procedures were effective.

97.     Specifically, the 2015 10-K provided, among other things, the Company's consolidated financial data for the years ended December 31, 2013, 2014 and 2015, including:

**AMTRUST FINANCIAL SERVICES, INC. AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**
**(In Thousands, Except Par Value per Share)**

|  | December 31, | |
| --- | --- | --- |
| **ASSETS** | **2015** | **2014** |
| Investments: | | |
| Fixed maturities, available-for-sale, at fair value (amortized cost $5,482,042; | $  5,433,797 | $  4,253,274 |

| | | |
|---|---:|---:|
| $4,137,146) | | |
| Equity securities, available-for-sale, at fair value (cost $109,346; $84,075) | 104,497 | 81,044 |
| Equity securities, trading, at fair value (cost $26,937; $25,407) | 27,271 | 26,749 |
| Short-term investments | 84,266 | 63,916 |
| Equity investment in unconsolidated subsidiaries – related parties | 138,023 | 119,712 |
| Other investments (related party $64,869; $0; recorded at fair value $30,309; $13,315) | 99,012 | 31,186 |
| **Total investments** | 5,886,866 | 4,575,881 |
| Cash and cash equivalents | 931,970 | 902,750 |
| Restricted cash and cash equivalents | 380,699 | 186,225 |
| Accrued interest and dividends | 51,487 | 42,173 |
| Premiums receivable, net | 2,115,653 | 1,851,682 |
| Reinsurance recoverable (related party $1,963,140; $1,517,499) | 3,008,670 | 2,440,627 |
| Prepaid reinsurance premium (related party $1,066,961; $918,505) | 1,531,866 | 1,302,848 |
| Other assets (related party $189,223; $136,516; recorded at fair value $264,001; $264,517) | 1,418,677 | 1,094,943 |
| Deferred policy acquisition costs | 704,243 | 628,383 |
| Property and equipment, net | 281,456 | 154,175 |
| Goodwill | 432,700 | 352,685 |
| Intangible assets | 367,345 | 314,996 |
| | $ 17,111,632 | $ 13,847,368 |

### LIABILITIES AND STOCKHOLDERS' EQUITY

| | | |
|---|---:|---:|
| **Liabilities:** | | |
| Loss and loss adjustment expense reserves | $ 7,208,367 | $ 5,664,205 |
| Unearned premiums | 4,014,728 | 3,447,203 |
| Ceded reinsurance premiums payable (related party $379,988; $410,075) | 651,051 | 683,421 |
| Reinsurance payable on paid losses | 9,789 | 3,947 |
| Funds held under reinsurance treaties | 23,336 | 10,653 |
| Note payable on collateral loan – related party | 167,975 | 167,975 |
| Securities sold but not yet purchased, at fair value | 38,618 | 13,052 |
| Accrued expenses and other liabilities (recorded at fair value $93,940; $60,271) | 901,112 | 795,877 |
| Deferred income taxes | — | 106,363 |
| Debt | 1,009,969 | 757,871 |
| **Total liabilities** | 14,024,945 | 11,650,567 |
| **Commitments and contingencies** | | |
| **Redeemable non-controlling interest** | 1,172 | 600 |
| **Stockholders' equity:** | | |
| Common stock, $0.01 par value; 500,000 and 300,000 shares authorized, 196,455 and 196,422 issued in 2015 and 2014, respectively; 175,915 and 155,478 outstanding in 2015 and 2014, respectively | 1,964 | 1,960 |
| Preferred stock, $0.01 par value; 10,000 shares authorized, 4,968 and 4,785 issued and outstanding in 2015 and 2014, respectively, Aggregated liquidation preference $482,500, $300,000 in 2015 and 2014, respectively | 482,500 | 300,000 |
| Additional paid-in capital | 1,383,492 | 1,021,789 |
| Treasury stock at cost; 20,540 and 40,944 shares in 2015 and 2014, respectively | (162,867) | (297,586) |
| Accumulated other comprehensive income (loss) | (130,262) | 56,123 |

| | | |
|---|---|---|
| Retained earnings | 1,334,233 | 954,734 |
| **Total AmTrust Financial Services, Inc. equity** | 2,909,060 | 2,037,020 |
| **Non-controlling interest** | 176,455 | 159,181 |
| **Total stockholders' equity** | 3,085,515 | 2,196,201 |
| | $ 17,111,632 | $ 13,847,368 |

**AMTRUST FINANCIAL SERVICES, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF INCOME**
**(In Thousands, Except Par Value and per Share)**

| | Years Ended December 31, | | |
|---|---|---|---|
| | **2015** | **2014** | **2013** |
| **Revenues:** | | | |
| Premium income: | | | |
| Net written premium | $ 4,260,058 | $ 3,956,618 | $ 2,565,673 |
| Change in unearned premium | (238,331) | (430,054) | (299,683) |
| **Net earned premium** | 4,021,727 | 3,526,564 | 2,265,990 |
| Service and fee income (related parties - $76,454, $58,428,and $51,545) | 478,206 | 409,743 | 331,559 |
| Net investment income | 156,290 | 131,601 | 84,819 |
| Net realized gain on investments | 8,117 | 16,423 | 15,527 |
| **Total revenues** | 4,664,340 | 4,084,331 | 2,697,895 |
| **Expenses:** | | | |
| Loss and loss adjustment expense | 2,682,208 | 2,342,619 | 1,517,361 |
| Acquisition costs and other underwriting expenses (net of ceding commission - related party - $510,792; $405,071, and $276,556) | 979,502 | 856,923 | 533,162 |
| Other | 466,759 | 436,350 | 291,617 |
| **Total expenses** | 4,128,469 | 3,635,892 | 2,342,140 |
| **Income before other income (expense), provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest** | 535,871 | 448,439 | 355,755 |
| **Other income (expenses):** | | | |
| Interest expense (net of interest income - related party - $8,701, $2,601, and $0) | (48,052) | (45,857) | (34,691) |
| Loss on extinguishment of debt | (5,271) | (9,831) | — |
| Gain on investment in life settlement contracts net of profit commission | 19,844 | 12,306 | 3,800 |
| Foreign currency gain (loss) | 43,260 | 60,245 | (6,533) |
| Gain on acquisition | 5,826 | — | 48,715 |
| Gain of sale of subsidiary | — | 6,631 | — |
| **Total other income (expenses)** | 15,607 | 23,494 | 11,291 |
| **Income before income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest** | 551,478 | 471,933 | 367,046 |
| **Provision for income taxes** | 66,341 | 53,686 | 98,019 |
| **Income before equity in earnings of unconsolidated subsidiaries** | 485,137 | 418,247 | 269,027 |
| **Equity in earnings of unconsolidated subsidiary – (related parties)** | 25,385 | 28,351 | 11,566 |
| **Net income** | 510,522 | 446,598 | 280,593 |
| **Net (income) loss attributable to non-controlling interests and redeemable non-controlling interests of subsidiaries** | (6,928) | 416 | 1,633 |

| | | | | | |
|---|---|---|---|---|---|
| **Net income attributable to AmTrust stockholders** | $ | 503,594 | $ | 447,014 | $ | 282,226 |
| Dividends on preferred stock | | (31,590) | | (12,738) | | (3,989) |
| **Net income attributable to AmTrust common stockholders** | $ | 472,004 | $ | 434,276 | $ | 278,237 |
| **Earnings per common share:** | | | | | | |
| Basic earnings per share | $ | 2.86 | $ | 2.89 | $ | 1.87 |
| Diluted earnings per share | $ | 2.80 | $ | 2.72 | $ | 1.78 |
| **Dividends declared per common share** | $ | 0.55 | $ | 0.425 | $ | 0.28 |
| **Weighted average common shares outstanding – basic** | | 165,042 | | 149,866 | | 148,326 |
| **Weighted average common shares outstanding – diluted** | | 168,360 | | 159,034 | | 155,968 |
| **Net realized gain on investments:** | | | | | | |
| Total other-than-temporary impairment losses | $ | (19,155) | $ | (8,039) | $ | (2,869) |
| Portion of loss recognized in other comprehensive income | | — | | — | | — |
| Net impairment losses recognized in earnings | | (19,155) | | (8,039) | | (2,869) |
| Net realized gain on available for sale securities | | 15,578 | | 21,858 | | 18,396 |
| Net realized gain on trading securities and other investment | | 11,694 | | 2,604 | | — |
| **Net realized investment gain** | $ | 8,117 | $ | 16,423 | $ | 15,527 |

## AMTRUST FINANCIAL SERVICES, INC. AND SUBSIDIARIES
### CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME
#### (In Thousands)

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2015** | **2014** | **2013** |
| Net income | $ 510,522 | $ 446,598 | $ 280,593 |
| **Other comprehensive (loss) income, net of tax:** | | | |
| Foreign currency translation adjustments | (77,437) | (17,358) | 12,943 |
| Change in fair value of interest rate swap | 621 | 664 | 1,028 |
| Minimum pension liability | 2,686 | (1,055) | (1,738) |
| Unrealized (loss) gain on securities: | | | |
| Gross unrealized holding (loss) gain | (177,618) | 133,775 | (138,902) |
| Less tax (benefit) expense | (62,166) | 46,821 | (48,616) |
| Net unrealized holding (loss) gain | (115,452) | 86,954 | (90,286) |
| Reclassification adjustment for investment gain (loss) included in net income, net of tax: | | | |
| Other-than-temporary impairment loss | 4,315 | — | — |
| Other net realized (loss) gain on investments | (1,118) | (4,918) | 5,658 |
| Reclassification adjustment for investment gain (loss) included in net income | 3,197 | (4,918) | 5,658 |
| **Other comprehensive (loss) income, net of tax** | $ (186,385) | $ 64,287 | $ (72,395) |
| **Comprehensive income** | 324,137 | 510,885 | 208,198 |
| Less: Comprehensive income (loss) attributable to non-controlling and redeemable non-controlling interest | 6,928 | (416) | (1,633) |
| **Comprehensive income attributable to AmTrust Financial Services, Inc.** | $ 317,209 | $ 511,301 | $ 209,831 |

**AMTRUST FINANCIAL SERVICES, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(In Thousands)**

| | Years Ended December 31, | | |
|---|---|---|---|
| | **2015** | **2014** | **2013** |
| **Cash flows from operating activities:** | | | |
| Net income | $    510,522 | $    446,598 | $    280,593 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | 88,012 | 63,093 | 53,118 |
| Net amortization of bond premium or discount | 17,401 | 15,395 | 18,925 |
| Equity earnings on investment in unconsolidated subsidiaries | (25,385) | (28,351) | (11,566) |
| Gain on investment in life settlement contracts, net | (19,844) | (12,306) | (3,800) |
| Realized gain on marketable securities | (27,272) | (24,463) | (18,396) |
| Non-cash write-down of marketable securities | 19,155 | 8,039 | 2,869 |
| Non-cash write-down of goodwill | 55,304 | 62,898 | 10,226 |
| Discount on notes payable | 5,628 | 3,095 | 3,000 |
| Stock based compensation | 22,763 | 19,114 | 11,186 |
| Loss on extinguishment of debt | 5,271 | 9,831 | — |
| Bad debt expense | 18,339 | 24,294 | 24,334 |
| Foreign currency (gain) loss | (43,260) | (60,245) | 6,533 |
| Gain on sale of subsidiary | — | (6,631) | — |
| Acquisition gain | (5,826) | — | (48,715) |
| Dividend received from equity investment | 984 | 246 | 12,203 |
| Changes in assets – (increase) decrease: | | | |
| Premiums and notes receivable | (304,088) | (251,544) | (189,503) |
| Reinsurance recoverable | (570,163) | (503,926) | (547,578) |
| Deferred policy acquisition costs, net | (75,860) | (159,979) | (97,561) |
| Prepaid reinsurance premiums | (151,241) | (291,544) | (133,787) |
| Prepaid expenses and other assets | (273,096) | (123,867) | (310,177) |
| Changes in liabilities – increase (decrease): | | | |
| Reinsurance premium payable | 20,687 | 48,656 | 87,520 |
| Loss and loss expense reserves | 1,440,388 | 1,219,993 | 1,177,625 |
| Unearned premiums | 380,386 | 706,976 | 586,219 |
| Funds held under reinsurance treaties | 9,955 | (10,397) | (6,372) |
| Accrued expenses and other current liabilities | 78,775 | 62,533 | 43,640 |
| Deferred tax asset and liability, net | (186,757) | (75,024) | 21,623 |
| **Net cash provided by operating activities** | 990,778 | 1,142,484 | 972,159 |
| **Cash flows from investing activities:** | | | |
| Purchases of fixed maturities, available-for-sale | (2,372,204) | (2,425,101) | (2,473,116) |
| Purchases of equity securities, available-for-sale | (87,190) | (293,554) | (41,374) |
| Purchases of equity securities, trading | (207,379) | (84,493) | — |
| Purchases of other investments | (72,554) | (20,207) | (17,228) |
| Sales of fixed maturities, available-for-sale | 1,208,102 | 1,749,897 | 1,612,580 |
| Sales of equity securities, available-for-sale | 66,400 | 238,369 | 68,585 |

| | 2015 | 2014 | 2013 |
|---|---|---|---|
| Sales of equity securities, trading | 207,992 | 78,974 | — |
| Sales of other investments | 2,510 | 17,854 | 6,102 |

**AMTRUST FINANCIAL SERVICES, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS – (Continued)**
**(In Thousands)**

| | Years Ended December 31, | | |
|---|---|---|---|
| | **2015** | **2014** | **2013** |
| Net sales (purchases) of short term investments | 4,224 | 50,286 | 9,550 |
| Net sale (purchase) of securities sold but not purchased | 25,566 | 13,052 | (56,711) |
| Acquisition of and capitalized premiums for life settlement contracts | (1,065) | (25,419) | (51,070) |
| Receipt of life settlement contract proceeds | 102,307 | 10,035 | 20,054 |
| Loan to ACP Re | — | (125,000) | — |
| Acquisition of reinsurance entities, net of cash obtained | — | — | 17,811 |
| Acquisition of subsidiaries, net of cash obtained | (242,358) | (80,736) | (20,182) |
| Sale of subsidiary | — | 20,059 | — |
| Increase in restricted cash and cash equivalents, net | (194,532) | (85,786) | (21,677) |
| Purchase of property and equipment | (167,510) | (77,172) | (39,586) |
| **Net cash used in investing activities** | (1,727,691) | (1,038,942) | (986,262) |
| **Cash flows from financing activities:** | | | |
| Revolving credit facility borrowings | 430,000 | 220,000 | — |
| Revolving credit facility payments | (420,000) | (100,000) | — |
| Repurchase agreements, net | — | (293,222) | 58,311 |
| Secured loan agreement borrowings | 10,250 | 30,500 | — |
| Secured loan agreement payments | (7,001) | (3,009) | (1,299) |
| Promissory note payments | — | (10,695) | — |
| 2055 Subordinated notes proceeds | 285,000 | — | — |
| Senior notes proceeds | — | — | 250,000 |
| Convertible senior notes proceeds | — | 68,400 | — |
| Convertible senior notes payments | (62,079) | — | — |
| Financing fees | (9,451) | (5,188) | (2,740) |
| Common share issuance | 487,087 | — | 472 |
| Common share repurchase | (578) | (59,155) | — |
| Preferred share issuance | 176,529 | 178,641 | 111,130 |
| Non-controlling interest capital contributions (dividends) to consolidated subsidiaries, net | 11,475 | 18,223 | 36,149 |
| Stock option exercise and other | (2,556) | 8,776 | 8,062 |
| Dividends distributed on common stock | (85,296) | (55,599) | (29,236) |
| Dividends distributed on preferred stock | (31,590) | (12,738) | (3,989) |
| **Net cash provided by (used in) financing activities** | 781,790 | (15,066) | 426,860 |
| **Effect of exchange rate changes on cash** | (15,657) | (15,748) | 2,895 |
| **Net increase in cash and cash equivalents** | 29,220 | 72,728 | 415,652 |
| **Cash and cash equivalents, beginning year** | 902,750 | 830,022 | 414,370 |
| **Cash and cash equivalents, end of year** | $ 931,970 | $ 902,750 | $ 830,022 |

**Supplemental Cash Flow Information**

| | | | | | |
|---|---|---|---|---|---|
| Interest payments on debt | $ | 43,146 | $ | 36,679 | $ | 20,768 |
| Income tax payments | | 234,455 | | 85,619 | | 65,652 |
| Declared dividends on common stock | | 92,505 | | 64,538 | | 39,808 |

98.    Additionally, the 2015 10-K stated, in pertinent part:

**Disclosure Controls and Procedures**

Our management, with participation and under the supervision of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this report. Based on such evaluation, our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO") have concluded that, as of the end of such period, our disclosure controls and procedures are effective in ensuring that information required to be disclosed by us in the reports we file or submit under the Exchange Act is timely recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure.

**Changes in Internal Controls Over Financial Reporting**

There have not been any changes in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended December 31, 2015 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Management Report on Internal Control Over Financial Reporting**

We, as management of the Company, are responsible for establishing and maintaining adequate internal control over financial reporting. Pursuant to the rules and regulations of the SEC, internal control over financial reporting is a process designed by, or under the supervision of, our principal executive and principal financial officers, or persons performing similar functions, and effected by our Board of Directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:

- Pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the company;
- Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and
- Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements.

Management has evaluated the effectiveness of our internal control over financial reporting as of December 31, 2015, based on control criteria established in a report entitled *Internal Control – Integrated Framework (2013)*, issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on such evaluation, the CEO and CFO have concluded that our internal control over financial reporting is effective as of December 31, 2015.

99. Attached to the 2015 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) of the Exchange Act, Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX"), and 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the SOX, ("SOX Certifications"), signed by Defendants Zyskind and Pipoly, attesting to the accuracy of the 2015 10-K.

**2016 Proxy Statement**

100. On March 29, 2016, the Company filed its 2016 Proxy Statement with the SEC. The statements made in the 2016 Proxy Statement were false and misleading and failed to disclose that (1) the Company had ineffective assessment of the risks associated with its financial reporting; (2) the Company had an insufficient complement of corporate accounting and corporate financial reporting resources within the organization; (3) the Company did not appropriately recognize a portion of its warranty contract revenue; (4) the Company incorrectly expensed bonuses in the year paid rather than the year accrued; and (5) the Company lacked effective disclosure controls and internal controls over financial reporting.

**May 10, 2016 Form 10-Q**

101.    On May 10, 2016, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended March 31, 2016 (the "1Q 2016 10-Q"), which was signed by Defendants Zyskind and Pipoly.   The statements made in the 1Q 2016 10-Q were false and misleading and failed to disclose that (1) the Company had ineffective assessment of the risks associated with its financial reporting; (2) the Company had an insufficient complement of corporate accounting and corporate financial reporting resources within the organization; (3) the Company did not appropriately recognize a portion of its warranty contract revenue; (4) the Company incorrectly expensed bonuses in the year paid rather than the year accrued; and (5) the Company lacked effective internal controls over financial reporting.    Additionally, the statements falsely noted that the Company's disclosure controls and procedures were effective.

102.    In the 1Q 2016 10-Q, the Company stated, in relevant part:

> Our management, with the participation and under the supervision of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this report. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period, our disclosure controls and procedures are effective in ensuring that information required to be disclosed by us in the reports we file or submit under the Exchange Act is timely recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure.

> During the most recent fiscal quarter, there have been no changes in our internal controls over financial reporting (as defined in Exchange Act Rule 13a-15(f) and 15d-15(f)) that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

103.    Attached to the 1Q 2016 10-Q were SOX Certifications signed by Defendants Zyskind and Pipoly, attesting to the accuracy of the 1Q 2016 10-Q.

**<u>August 9, 2016 Form 10-Q</u>**

104.    On August 9, 2016, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended June 30, 2016 (the "2Q 2016 10-Q"), which was signed by Defendants Zyskind and Pipoly.  The statements made in the 2Q 2016 10-Q were false and misleading and failed to disclose that (1) the Company had ineffective assessment of the risks associated with its financial reporting; (2) the Company had an insufficient complement of corporate accounting and corporate financial reporting resources within the organization; (3) the Company did not appropriately recognize a portion of its warranty contract revenue; (4) the Company incorrectly expensed bonuses in the year paid rather than the year accrued; and (5) the Company lacked effective internal controls over financial reporting.  Additionally, the statements falsely noted that the Company's disclosure controls and procedures were effective.

105.    In the 2Q 2016 10-Q, the Company stated, in relevant part:

> Our management, with the participation and under the supervision of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this report. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period, our disclosure controls and procedures are effective in ensuring that information required to be disclosed by us in the reports we file or submit under the Exchange Act is timely recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure.
>
> During the most recent fiscal quarter, there have been no changes in our internal controls over financial reporting (as defined in Exchange Act Rule 13a-15(f) and 15d-15(f) that have materially affected, or are

reasonably likely to materially affect, our internal control over financial reporting.

106.    Attached to the 2Q 2016 10-Q were SOX Certifications signed by Defendants Zyskind and Pipoly, attesting to the accuracy of the 2Q 2016 10-Q.

**November 14, 2016 Form 10-Q**

107.    On November 14, 2016, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended September 30, 2016 (the "3Q 2016 10-Q"), which was signed by Defendants Zyskind and Pipoly.  The statements made in the 3Q 2016 10-Q were false and misleading and failed to disclose that (1) the Company had ineffective assessment of the risks associated with its financial reporting; (2) the Company had an insufficient complement of corporate accounting and corporate financial reporting resources within the organization; (3) the Company did not appropriately recognize a portion of its warranty contract revenue; (4) the Company incorrectly expensed bonuses in the year paid rather than the year accrued; and (5) the Company lacked effective internal controls over financial reporting. Additionally, the statements falsely noted that the Company's disclosure controls and procedures were effective.

108.    In the 3Q 2016 10-Q, the Company stated, in relevant part:

> Our management, with the participation and under the supervision of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this report. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period, our disclosure controls and procedures are effective in ensuring that information required to be disclosed by us in the reports we file or submit under the Exchange Act is timely recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure.

During the most recent fiscal quarter, there have been no changes in our internal controls over financial reporting (as defined in Exchange Act Rule 13a-15(f) and 15d-15(f)) that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

109.    Attached to the 3Q 2016 10-Q were SOX Certifications signed by Defendants Zyskind and Pipoly, attesting to the accuracy of the 3Q 2016 10-Q.

## THE TRUTH EMERGES

### February 27, 2017 Press Release

110.    On February 27, 2017, the Company issued a press release titled "AmTrust Financial Services, Inc. Reports Fourth Quarter 2016 Net Income Per Diluted Share of $0.57 and Operating Earnings Per Diluted Share of $0.38, Reflecting Strengthening of Reserves," where it presented fourth quarter and full year highlights for the fiscal year ended December 31, 2016 and provided an update on the anticipated timing of the filing of its annual report on Form 10-K with the SEC.  The Company disclosed that it would take an unexpected $65 million reserve charge.

111.    In its press release, the Company stated, in relevant part:

**Update on Anticipated Timing of 10-K Filing**

On or before March 1, 2017, AmTrust intends to file a Form 12b-25 with the Securities and Exchange Commission providing the Company an automatic 15-day extension to file its Form 10-K for the year ended December 31, 2016. As previously disclosed, the Company appointed a new independent registered public accounting firm on April 1, 2016. Additional time is needed for the Company to complete its consolidated financial statements and assessment of internal controls over financial reporting for the fiscal year ended December 31, 2016, and, as a consequence, for the Company's auditor, KPMG LLP, to complete its audit procedures and audit of the consolidated financial statements included in the Form 10-K. The Company expects to file the Annual Report on Form 10-K within the 15-day extension period provided by Rule 12b-25.

In addition, the Company expects to make immaterial corrections to errors in its financial statements for fiscal years ended December 31, 2015 and 2014 and certain financial information for fiscal years ended December

31, 2013 and 2012 for inclusion in the Form 10-K and these processes have not been completed.  The Company is still evaluating corrections to its historical quarterly financial statements within these fiscal years.  For a further explanation, please see footnote (1) below.

In connection with the foregoing, the Company expects to disclose in the Form 10-K that, as part of its evaluation of its internal controls over financial reporting as required by Section 404 of the Sarbanes-Oxley Act of 2002, the Company identified material weaknesses in its internal control over financial reporting that existed as of December 31, 2016, specifically related to ineffective assessment of the risks associated with the financial reporting, and an insufficient complement of corporate accounting and corporate financial reporting resources within the organization.  As the Company completes the preparation of its financial statements and the related audit process for fiscal year 2016, additional adjustments and/or material weaknesses could be identified. While the Company believes that significant progress has been made in enhancing internal controls as of December 31, 2016 and in the period since, the material weaknesses have not been fully remediated due to insufficient time to fully implement and assess the design and operating effectiveness of the related controls. The Company will continue the process to enhance internal controls throughout 2017.

\* \* \*

(1) The Company identified and corrected errors during the three months ended December 31, 2016 related to prior periods in 2016 and 2015. These errors included accruing for bonuses paid (which also impacted prior periods), adjusting foreign currency transactions gain and loss and deferring a portion of warranty contract revenue associated with administration services previously recognized upfront, based on management's interpretation of accounting guidance related to multiple-element revenue recognition. In 2016, management reviewed this accounting treatment and concluded that its warranty contracts should not be accounted for using the multiple-element guidance, but instead deferred over the life of the contract. The Company assessed the materiality of these errors and determined that a one-time adjustment in 2016 would have been material to 2016 and, as a result, management elected to revise the 2015 and prior financial statements upon its conclusion that the impact of the errors was not material to the 2015 and prior period financial statements.  The resulting revisions to the Company's consolidated statements of income, for the three months and year ended December 31, 2015, will be reflected in all future releases that contain such consolidated financial statements. Selected unaudited estimated revisions to our previously issued financial information are set forth below:

| | Three Months Ended December 31, 2015 | | Year Ended December 31, 2015 | |
| --- | --- | --- | --- | --- |
| | Revised | As Previously Reported | Revised | As Previously Reported |
| Service and fee income | $        120,046 | $        131,440 | $        429,612 | $        478,206 |
| Other revenue | 142,479 | 153,873 | 594,019 | 642,613 |
| Total revenue | 1,200,451 | 1,211,845 | 4,615,746 | 4,664,340 |
| Acquisition costs and other underwriting expense | 251,889 | 251,100 | 982,658 | 979,502 |
| Total expense | 1,124,271 | 1,125,218 | 4,122,966 | 4,128,469 |
| Income before other income (expense), provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest | 76,180 | 86,627 | 492,780 | 535,871 |
| Foreign currency gain | 29,962 | 24,721 | 59,488 | 17,355 |
| Income before provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest | 91,612 | 98,002 | 524,615 | 551,478 |
| Provision for income taxes | 25,469 | 27,706 | 56,939 | 66,341 |
| Net income | 68,480 | 72,633 | 493,061 | 510,522 |
| Net income attributable to AmTrust stockholders | 68,492 | 72,645 | 486,133 | 503,594 |
| Net income attributable to AmTrust common stockholders[1] | 59,699 | 63,852 | 454,543 | 472,004 |
| Operating earnings[2] attributable to AmTrust common stockholders | 115,675 | 123,885 | 493,043 | 526,732 |
| Basic earnings per share | $          0.35 | $          0.38 | $          2.75 | $          2.86 |
| Diluted earnings per share | $          0.35 | $          0.37 | $          2.70 | $          2.80 |
| Operating diluted earnings per share[2] | $          0.67 | $          0.72 | $          2.93 | $          3.13 |
| Return on equity | 11.2 % | 11.2 % | 23.4 % | 22.7 % |
| Operating return on equity[2] | 21.7 % | 21.7 % | 25.4 % | 25.3 % |
| AmTrust's stockholders' equity | | | 2,753,468 | 2,909,060 |

## February 27, 2017 Earnings Call

112.     On February 27, 2017, the Company held an earnings call in which it discussed its results for the fiscal quarter ended December 31, 2016, the transcript of which was published on *Seeking Alpha*.   In the earnings call, Defendant Pipoly also discussed the Company's internal controls over financial reporting.

113.     In the Company's earnings call, Defendant Pipoly stated, in relevant part:

> Additional time is needed for us to conclude our consolidated financial statements and assess internal controls over financial reporting for fiscal year 2016.   And as a consequence for KPMG to complete its audit procedures and to audit the consolidated financial statements included in

Form 10-K we will need a little additional time.  As such, we expect to file our 10-K on or before March 16th, which we can still be considered a timely filer for SEC reporting purposes.

In addition as part of our year-end close work, we've reviewed our internal controls of our financial reporting as required by Section 404 of the Sarbanes-Oxley Act of 2002 and identify material weaknesses in our internal control structure over financial reporting.

These specifically relate to ineffective assessment of risk associated with financial reporting in an insufficient complement of corporate accounting and corporate financial reporting resources within the organization.

We expect to complete the remaining work quickly and file the 10-K within [the allotted] 15 day expansion period. We've started the process to improve our internal controls over financial reporting. We are expanding and enhancing our senior financial leadership team so we have the expertise and resources AmTrust need.

114.    On this news, AmTrust's share price fell $5.32, or 19.23%, to close at $22.34 on February 27, 2017.

**March 16, 2017 Press Release**

115.    On March 16, 2017, the Company issued a press release titled "AmTrust Financial Services, Inc. Provides Update on 10-K Filing," where the Company announced that they would need more time before filing their Form 10-K for the fiscal year ended 2016 and that they concluded that their financial statements for 2014, 2015, and first three quarters of 2016 should be restated and should not be relied upon.  The press release stated, in relevant part:

NEW YORK, March 16, 2017 (GLOBE NEWSWIRE) -- AmTrust Financial Services, Inc. (Nasdaq: AFSI) (the "Company" or "AmTrust") today stated that additional time is needed for the Company to complete its consolidated financial statements and assessment of internal controls over financial reporting for the fiscal year ended December 31, 2016, and, as a consequence, for the Company's auditor, KPMG LLP, to complete its audit procedures and audit of the consolidated financial statements included in the Form 10-K. Accordingly, the Company will file its Form 10-K for the year ended December 31, 2016 as soon as practicable.

In connection with the preparation and audit of the financial statements to be included in the Company's Form 10-K for the year ended December

31, 2016, the Audit Committee of the AmTrust Board of Directors, in consultation with management and its current and former independent auditors, concluded that the Company's previously issued consolidated financial statements for 2014 and 2015 (including for each of the four quarters of 2015) as well as for the first three quarters of 2016 should be restated and should no longer be relied upon. In addition, the Company's earnings and press releases and similar communications, to the extent that they relate to the periods covered by these financial statements, as well as the Company's fourth quarter and fiscal 2016 earnings release dated February 27, 2017, should no longer be relied upon. Additionally, the reports of BDO USA LLP, the Company's former independent auditor, on the Company's consolidated financial statements for 2014 and 2015, including its opinions on the effectiveness of internal control over financial reporting for such periods, likewise should no longer be relied upon.

\* \* \*

The Company is restating its financial statements and related disclosures primarily to correct two errors reported in its historical consolidated financial statements.  These errors relate to: (1) upfront recognition of a portion of warranty contract revenue associated with administration services, based on the interpretation of ASC 605, Revenue Recognition, used in the previously filed financial statements related to multiple-element revenue recognition, instead of deferring recognition of the revenue over the life of the contract; and (2) bonuses that were expensed in the year paid but that should have been accrued in the year earned based on ASC 710, Compensation, and ASC 270, Interim Reporting.  The first error will be reflected entirely within the results of operations for our Specialty Risk and Extended Warranty segment, while the second error will be reflected within the results of operations of all of our segments.  The Company will also make other miscellaneous adjustments that had been previously identified but not corrected because they were not material, individually or in the aggregate, to its previously issued consolidated financial statements. In addition, the Company expects to have certain other non-cash corrections primarily related to deferred acquisitions costs and the capitalization of software development costs in 2016.

116.    On this news, AmTrust's share price fell $4.03, or nearly 19%, from previous day's closing price of $21.61 to close at $17.58 on March 17, 2017.

117.    On April 4, 2017, the Company issued a press release announcing that the Company filed its Form 10-K for the year ended December 31, 2016, including restated financial

statements and related disclosures for 2014 and 2015.  Concerning the impact of the restatements

the press release stated, in relevant part:

> As AmTrust previously reported, the restatements primarily involve the timing of recognition of revenue in the Company's service and fee business. The total impact of the restatements to net income attributable to common stockholders in 2014 and 2015 was a decline of 7.2% and 11.2%, respectively. Net income attributable to common stockholders in fiscal years 2014, 2015, and 2016, was $402.9 million, $419.1 million, and $363.1 million, respectively. Gross written premium, net earned premium, loss and loss adjustment expense and loss ratio for 2016 and loss and loss adjustment expense reserves as of December 31, 2016, remained unchanged from the amounts reported by the Company in its earnings release dated February 27, 2017.

118.    The Company's Form 10-K filed with the SEC the same day ("2016 10-K")

revealed the total impact of the restatements to net income in 2015 was an 11.12% reduction.

119.    The 2016 10-K further explained the impact of the Company's financial

restatements:

> The impact of the Restatement on the Consolidated Statements of Income primarily resulted in decreased service and fee income, increased acquisition costs and other underwriting expenses, and decreased interest expense, which ultimately resulted in decreases to net income. The impact of the Restatement on the Consolidated Balance Sheets primarily resulted in an increase of premiums receivable and other assets, a reduction of deferred policy acquisition costs and property plant and equipment, an increase in accrued expenses and other liabilities, and a decrease in shareholders' equity. The impact of the Restatement adjustments on the Consolidated Statements of Cash Flows resulted in an increase of net cash provided by operating activities in both 2015 and 2014, an increase of net cash provided by investing activities in 2015 and 2014, and a decrease in net cash provided by financing activities in 2015 and 2014.
>
> The Restatement presents the effect of an adjustment to opening retained earnings as of January 1, 2014, which adjustment reflects the impact of the Restatement on periods prior to 2014. The cumulative effect of those adjustments decreased previously reported stockholders' equity by $88.4 million as of December 31, 2013.

120.    Specifically, the Company noted in the 2016 10-K that it made the following

corrections:

(1)     Warranty Fee Revenue – During the preparation of its financial statements for the year ended December 31, 2016, management became aware of a potential misapplication of the revenue recognition guidance in relation to its accounting for warranty contract revenue associated with promotion, marketing and administration services (collectively, "administration services") provided as part of extended service plans ("ESPs"). The Company has historically recognized the majority of revenue related to administration services at the time of the sale of ESP. However, the Company revised its application of the revenue recognition guidance to record revenue related to administration services on a straight-line basis over the term of the ESP contracts. This correction of an error, which created an overstatement of service and fee income and an overstatement of other expenses that were also recognized upfront in current periods, required a restatement of the Company's previously issued financial statements.

(2)     Accrual of Bonuses – In prior years, the Company had expensed discretionary bonuses paid to its employees in the year the bonuses were paid because the Company did not consider the discretionary bonuses to be "probable," which is the standard required for accrual. Upon review of ASC 270, *Interim Reporting*, and ASC 450, *Contingencies*, management determined that its application was incorrect because, even though the bonuses were discretionary, the bonuses should have been estimated and expenses assigned to interim periods so that the interim periods bear a reasonable portion of the anticipated annual amount. This created an error resulting in an overstatement of acquisition costs and other underwriting expenses, requiring a restatement of the Company's previously issued financial statements.

(3)     Deferred Acquisition Costs – The Company corrected errors in its calculation of deferred acquisition costs related to (a) the over-amortization of certain deferred acquisition costs in 2015, resulting in an overstatement of expenses in 2015, (b) the capitalization of certain salaries and consulting fees that were not eligible for deferral, resulting in an understatement of expenses, (c) the treatment of certain costs in the Company's U.K. operations as both underwriting expenses and salary and benefit expenses, resulting in the duplication of the amount capitalized and deferred, and (d) the inclusion of deferred warranty administration fees and obligor liabilities associated with the administration services provided to our ESPs.

(4)     Foreign exchange gain/(loss) – The Company corrected errors related to the re-measurement of monetary balances denominated in foreign currencies into their functional currencies that were recorded as other comprehensive income. Given the monetary nature of some of these

assets, the re-measurement impact should have been recorded as foreign currency transaction gain/(loss) in our income statements.

(5)      Capitalized software – The Company capitalized certain internally developed software costs that did not meet criteria for deferral under ASC 350, *Intangibles - Goodwill and Other*. This error resulted in an over-capitalization of certain software expenses, and an understatement of expenses.

(6)      Imputed interest – The Company corrected an error related to interest imputed on contingent consideration owed as a result of certain business acquisitions, which resulted in an understatement of interest expense in 2015.

(7)      Intercompany eliminations – The Company corrected an error related to internal brokerage commissions paid from one of its subsidiaries to another subsidiary, which should have been eliminated in consolidation, thereby causing an overstatement of commission income in 2015.

(8)      Other Items – The Company corrected other errors that impacted the 2014 and 2015 consolidated financial statements, including unaccrued liabilities, uncollectible other receivables, accrued commissions, unrecognized amortization expense, unrealized loss on investments and proper year end cut-off related to premiums and claims.

(9)      Balance Sheet Items – The Company historically recorded certain receivables (premium and other) net of commissions and now records the receivables on a gross basis, with the associated commission payable in other accrued expenses and liabilities. In addition, the Company corrected a classification error involving short term investments and cash/cash equivalents, and fixed assets and other investments in the Consolidated Balance Sheets.

121.    In the 2016 10-K, the Company provided the following tables summarizing the impact of the restatements on its previously reported Consolidated Balance Sheets, Consolidated Statements of Income, Consolidated Statements of Comprehensive Income, Consolidated Statements of Stockholders' Equity and Consolidated Statements of Cash Flows for the years ending December 31, 2015 and 2014:

| | **Consolidated Balance Sheet** | | | |
| --- | --- | --- | --- | --- |
| | **December 31, 2015** | | | |
| **ASSETS** | **As previously reported** | **Adjustments** | **As restated** | **Reference** |

| | | (in thousands) | | |
|---|---|---|---|---|
| Investments: | | | | |
| Fixed maturities, available-for-sale, at fair value (amortized cost $5,482,042) | $ 5,433,797 | $ — | $ 5,433,797 | |
| Equity securities, available-for-sale, at fair value (cost $109,346) | 104,497 | — | 104,497 | |
| Equity securities, trading, at fair value (cost $26,937) | 27,271 | — | 27,271 | |
| Short-term investments | 84,266 | (67,095) | 17,171 | 9 |
| Equity investment in unconsolidated subsidiaries – related parties | 138,023 | | 138,023 | |
| Other investments (related party $64,869) | 99,012 | 7,164 | 106,176 | 8 |
| **Total investments** | 5,886,866 | (59,931) | 5,826,935 | |
| Cash and cash equivalents | 931,970 | 71,946 | 1,003,916 | 8, 9 |
| Restricted cash and cash equivalents | 380,699 | — | 380,699 | |
| Accrued interest and dividends | 51,487 | | 51,487 | |
| Premiums receivable, net | 2,115,653 | 120,300 | 2,235,953 | 8, 9 |
| Reinsurance recoverable (related party $1,963,140) | 3,008,670 | (1,293) | 3,007,377 | 8 |
| Prepaid reinsurance premium (related party $1,066,961) | 1,531,866 | — | 1,531,866 | |
| Other assets (related party $189,223; recorded at fair value $264,001) | 1,401,775 | 75,231 | 1,477,006 | 1 – 9 |
| Deferred policy acquisition costs | 704,243 | (10,604) | 693,639 | 3 |
| Property and equipment, net | 281,456 | (24,328) | 257,128 | 5, 8, 9 |
| Goodwill | 432,700 | | 432,700 | |
| Intangible assets | 367,345 | — | 367,345 | |
| | $ 17,094,730 | $ 171,321 | $17,266,051 | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| **Liabilities:** | | | | |
| Loss and loss adjustment expense reserves | $ 7,208,367 | $ — | $ 7,208,367 | |
| Unearned premiums | 4,014,728 | (341) | 4,014,387 | 8 |
| Ceded reinsurance premiums payable (related party $379,988) | 651,051 | — | 651,051 | |
| Reinsurance payable on paid losses | 9,789 | — | 9,789 | |
| Funds held under reinsurance treaties | 23,336 | — | 23,336 | |
| Note payable on collateral loan – related party | 167,975 | — | 167,975 | |
| Securities sold but not yet purchased, at fair value | 38,618 | — | 38,618 | |
| Accrued expenses and other liabilities (recorded at fair value $93,940) | 901,112 | 356,942 | 1,258,054 | 1, 2, 6, 8, 9 |
| Debt (net of debt issuance cost of $16,902) | 993,067 | — | 993,067 | |
| **Total liabilities** | 14,008,043 | 356,601 | 14,364,644 | |
| **Commitments and contingencies** | | | | |
| **Redeemable non-controlling interest** | 1,172 | — | 1,172 | |
| **Stockholders' equity:** | | | | |
| Common stock, $0.01 par value; 500,000 shares authorized, 196,455 issued; 175,915 outstanding | 1,964 | | 1,964 | |
| Preferred stock, $0.01 par value; 10,000 shares authorized, 4,968 issued and outstanding; Aggregated liquidation preference $482,500 | 482,500 | — | 482,500 | |
| Additional paid-in capital | 1,383,492 | — | 1,383,492 | |
| Treasury stock at cost; 20,540 shares | (162,867) | — | (162,867) | |
| Accumulated other comprehensive income (loss) | (130,262) | (3,130) | (133,392) | 4 |
| Retained earnings | 1,334,233 | (182,150) | 1,152,083 | 1 – 8 |
| **Total AmTrust Financial Services, Inc. equity** | 2,909,060 | (185,280) | 2,723,780 | |

| | | | |
|---|---:|---:|---:|
| Non-controlling interest | 176,455 | — | 176,455 |
| Total stockholders' equity | 3,085,515 | (185,280) | 2,900,235 |
| | $ 17,094,730 | $ 171,321 | $17,266,051 |

## AMTRUST FINANCIAL SERVICES, INC. AND SUBSIDIARIES

### NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
### (In Thousands, Except Per Share Data)

| | Consolidated Statement of Income | | | |
|---|---|---|---|---|
| | **Year ended December 31, 2015** | | | |
| | As previously reported | Adjustments | As restated | Reference |
| | (in thousands, except per share) | | | |
| **Revenues:** | | | | |
| Premium income: | | | | |
| Net written premium | $ 4,260,058 | $ 1,870 | $ 4,261,928 | 8 |
| Change in unearned premium | (238,331) | (2,356) | (240,687) | 8 |
| **Net earned premium** | 4,021,727 | (486) | 4,021,241 | |
| Ceding commission – primarily related party | — | | | |
| Service and fee income (related parties - $76,454) | 478,206 | (50,063) | 428,143 | 1, 8 |
| Net investment income | 156,290 | — | 156,290 | |
| Net realized gain on investments | 8,117 | — | 8,117 | |
| **Total revenues** | 4,664,340 | (50,549) | 4,613,791 | |
| **Expenses:** | | | | |
| Loss and loss adjustment expense | 2,682,208 | 5,910 | 2,688,118 | 8 |
| Acquisition costs and other underwriting expenses (net of ceding commission - related party - $545,661) | 979,502 | 14,069 | 993,571 | 2, 3, 5, 8 |
| Other | 466,759 | 6,494 | 473,253 | 1, 5, 7, 8 |
| **Total expenses** | 4,128,469 | 26,473 | 4,154,942 | |
| come before other (expense) income, provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest | 535,871 | (77,022) | 458,849 | |
| **Other (expenses) income:** | | | | |
| Interest expense (net of interest income - related party - $8,701) | (48,052) | (7,303) | (55,355) | 6 |
| Loss on extinguishment of debt | (5,271) | — | (5,271) | |
| Gain on investment in life settlement contracts net of profit commission | 19,844 | — | 19,844 | |
| Foreign currency (loss) gain | 43,260 | 4,041 | 47,301 | 4, 8 |
| Gain on acquisition | 5,826 | — | 5,826 | |
| Gain of sale of subsidiary | — | — | — | |
| **Total other (expenses) income** | 15,607 | (3,262) | 12,345 | |
| come before income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest | 551,478 | (80,284) | 471,194 | |
| Provision for income taxes | 66,341 | (27,395) | 38,946 | 1 – 8 |
| **Income before equity in earnings of unconsolidated subsidiaries** | 485,137 | (52,889) | 432,248 | |

| | | | |
|---|---|---|---|
| Equity in earnings of unconsolidated subsidiary – (related parties) | 25,385 | — | 25,385 |
| **Net income** | 510,522 | (52,889) | 457,633 |
| Net (income) loss attributable to non-controlling interests and redeemable non-controlling interests of subsidiaries | (6,928) | — | (6,928) |
| **Net income attributable to AmTrust stockholders** | $ 503,594 | $ (52,889) | $ 450,705 |
| Dividends on preferred stock | (31,590) | — | (31,590) |
| **Net income attributable to AmTrust common stockholders** | $ 472,004 | $ (52,889) | $ 419,115 |
| **Earnings per common share:** | | | |
| Basic earnings per share | $ 2.86 | $ (0.32) | $ 2.54 |
| Diluted earnings per share | $ 2.80 | $ (0.31) | $ 2.49 |
| **Dividends declared per common share** | $ 0.55 | $ — | $ 0.55 |
| **Weighted average common shares outstanding - basic** | 165,042 | — | 165,042 |
| **Weighted average common shares outstanding - diluted** | 168,360 | — | 168,360 |

## AMTRUST FINANCIAL SERVICES, INC. AND SUBSIDIARIES

## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
### (In Thousands, Except Per Share Data)

| | Consolidated Statement of Comprehensive Income | | | |
|---|---|---|---|---|
| | Year Ended December 31, 2015 | | | |
| | As previously reported | Adjustments | As restated | Reference |
| | (in thousands) | | | |
| Net income | $ 510,522 | $ (52,889) | $ 457,633 | |
| **Other comprehensive (loss) income, net of tax:** | | | | |
| Foreign currency translation adjustments | (77,437) | (11,815) | (89,252) | 4 |
| Change in fair value of interest rate swap | 621 | — | 621 | |
| Minimum pension liability | 2,686 | — | 2,686 | |
| Unrealized (loss) gain on securities: | | | | |
| Gross unrealized holding (loss) gain | (177,618) | 6,509 | (171,109) | 8 |
| Less tax (benefit) expense | (62,166) | 2,278 | (59,888) | 8 |
| Net unrealized holding (loss) gain | (115,452) | 4,231 | (111,221) | |
| Reclassification adjustment for investment gain (loss) included in net income, net of tax: | | | | |
| Other-than-temporary impairment loss | 4,315 | — | 4,315 | |
| Other net realized (loss) gain on investments | (1,118) | — | (1,118) | |
| Reclassification adjustment for investment gain (loss) included in net income | 3,197 | — | 3,197 | |
| **Other comprehensive (loss) income, net of tax** | $ (186,385) | $ (7,584) | $ (193,969) | |
| **Comprehensive income** | 324,137 | (60,473) | 263,664 | |
| Less: Comprehensive income (loss) attributable to non-controlling and redeemable non-controlling interest | 6,928 | — | 6,928 | |
| **Comprehensive income attributable to AmTrust Financial Services, Inc.** | $ 317,209 | $ (60,473) | $ 256,736 | |

| Consolidated Statement of Changes in Stockholders' Equity | | | |
| Year Ended December 31, 2015 | | | |
| As previously reported | Adjustments | As restated | Reference |
| (in thousands) | | | |
| Common stock | $ 1,964 | $ — | $ 1,964 | |
| Preferred stock | 482,500 | — | 482,500 | |
| Additional paid-in capital | 1,383,492 | — | 1,383,492 | |
| Treasury Stock | (162,867) | — | (162,867) | |
| Accumulated other comprehensive income (loss) | (130,262) | (3,130) | (133,392) | 4 |
| Retained earnings | 1,334,233 | (182,150) | 1,152,083 | 1 – 8 |
| | $ 2,909,060 | $ (185,280) | $ 2,723,780 | |

## AMTRUST FINANCIAL SERVICES, INC. AND SUBSIDIARIES

## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
### (In Thousands, Except Per Share Data)

| Consolidated Statements of Cash Flows | | | |
| Year ended December 31, 2015 | | | |
| As previously reported | Adjustments | As restated | Reference |
| (in thousands) | | | |
| **Cash flows from operating activities:** | | | |
| Net income | $ 510,522 | $ (52,889) | $ 457,633 | |
| Ijustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | 88,012 | (3,584) | 84,428 | 5 |
| Net amortization of bond premium or discount | 17,401 | — | 17,401 | |
| Equity earnings on investment in unconsolidated subsidiaries | (25,385) | — | (25,385) | |
| Gain on investment in life settlement contracts, net | (19,844) | — | (19,844) | |
| Realized gain on marketable securities | (27,272) | — | (27,272) | |
| Non-cash write-down of marketable securities | 19,155 | — | 19,155 | |
| Non-cash write-down of goodwill | 55,304 | — | 55,304 | |
| Discount on notes payable | 5,628 | — | 5,628 | |
| Stock based compensation | 22,763 | — | 22,763 | |
| Loss on extinguishment of debt | 5,271 | — | 5,271 | |
| Bad debt expense | 18,339 | — | 18,339 | |
| Foreign currency (gain) loss | (43,260) | (4,041) | (47,301) | 4, 8 |
| Gain on sale of subsidiary | — | — | — | |
| Acquisition gain | (5,826) | — | (5,826) | |
| Dividend received from equity investment | 984 | — | 984 | |
| Changes in assets – (increase) decrease: | | | |
| Premiums and notes receivable | (304,088) | (92,822) | (396,910) | 8, 9 |
| Reinsurance recoverable | (570,163) | 113 | (570,050) | 8 |
| Deferred policy acquisition costs, net | (75,860) | 11,483 | (64,377) | 3 |

| | | | | |
|---|---|---|---|---|
| Prepaid reinsurance premiums | (151,241) | — | (151,241) | |
| Prepaid expenses and other assets | (459,853) | (2,391) | (462,244) | 1 – 9 |
| Changes in liabilities – increase (decrease): | | | | |
| Reinsurance premium payable | 20,687 | — | 20,687 | |
| Loss and loss expense reserves | 1,440,388 | — | 1,440,388 | |
| Unearned premiums | 380,386 | (2,673) | 377,713 | 8 |
| Funds held under reinsurance treaties | 9,955 | — | 9,955 | |
| Accrued expenses and other current liabilities | 78,775 | 167,285 | 246,060 | 1, 2, 6, 8, 9 |
| **Net cash provided by operating activities** | 990,778 | 20,481 | 1,011,259 | |
| **Cash flows from investing activities:** | | | | |
| Purchases of fixed maturities, available-for-sale | (2,372,204) | 5,092 | (2,367,112) | 4 |
| Purchases of equity securities, available-for-sale | (87,190) | — | (87,190) | |
| Purchases of equity securities, trading | (207,379) | — | (207,379) | |
| Purchases of other investments | (72,554) | 1,202 | (71,352) | 8 |
| Sales, maturities, paydowns of fixed maturities, available-for-sale | 1,208,102 | — | 1,208,102 | |
| Sales of equity securities, available-for-sale | 66,400 | — | 66,400 | |
| Sales of equity securities, trading | 207,992 | — | 207,992 | |
| Sales of other investments | 2,510 | — | 2,510 | |
| Net sales of short term investments | 4,224 | 67,095 | 71,319 | 9 |
| Net sale of securities sold but not purchased | 25,566 | — | 25,566 | |
| Acquisition of life settlement contracts | (1,065) | — | (1,065) | |
| Receipt of life settlement contract proceeds | 102,307 | — | 102,307 | |

**AMTRUST FINANCIAL SERVICES, INC. AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(In Thousands, Except Per Share Data)**

| | Consolidated Statements of Cash Flows | | | |
|---|---|---|---|---|
| | Year Ended December 31, 2015 | | | |
| | As previously reported | Adjustments | As restated | Reference |
| Loan to ACP Re | — | — | — | |
| Acquisition of subsidiaries, net of cash obtained | (242,358) | — | (242,358) | |
| Sale of subsidiary | — | — | — | |
| Increase in restricted cash and cash equivalents, net | (194,532) | — | (194,532) | |
| Purchase of property and equipment | (167,510) | 15,261 | (152,249) | 5 |
| **Net cash used in investing activities** | (1,727,691) | 88,650 | (1,639,041) | |
| **Cash flows from financing activities:** | | | | |
| Revolving credit facility borrowings | 430,000 | — | 430,000 | |
| Revolving credit facility payments | (420,000) | — | (420,000) | |
| Repurchase agreements, net | — | — | — | |
| Secured loan agreement borrowings | 10,250 | — | 10,250 | |
| Secured loan agreement payments | (7,001) | — | (7,001) | |
| Promissory note payments | — | — | — | |

| | | | | |
|---|---|---|---|---|
| 2055 Subordinated notes proceeds | 285,000 | — | 285,000 | |
| Senior notes proceeds | — | — | — | |
| Convertible senior notes proceeds | — | — | — | |
| Convertible senior notes payments | (62,079) | — | (62,079) | |
| Financing fees | (9,451) | — | (9,451) | |
| Common share issuance | 487,087 | — | 487,087 | |
| Common share repurchase | (578) | — | (578) | |
| Preferred share issuance | 176,529 | — | 176,529 | |
| Contingent consideration payments | — | (15,334) | (15,334) | 6 |
| Non-controlling interest capital contributions (dividends) to consolidated subsidiaries, net | 11,475 | — | 11,475 | |
| Stock option exercise and other | (2,556) | — | (2,556) | |
| Dividends distributed on common stock | (85,296) | — | (85,296) | |
| Dividends distributed on preferred stock | (31,590) | — | (31,590) | |
| **Net cash provided by (used in) financing activities** | 781,790 | (15,334) | 766,456 | |
| **Effect of exchange rate changes on cash** | (15,657) | — | (15,657) | |
| **Net increase in cash and cash equivalents** | 29,220 | 93,797 | 123,017 | |
| **Cash and cash equivalents, beginning year** | 902,750 | (21,851) | 880,899 | 1, 2, 4 – 9 |
| **Cash and cash equivalents, end of year** | $ 931,970 | $ 71,946 | $ 1,003,916 | |
| **Supplemental Cash Flow Information** | | | | |
| Interest payments on debt | $ 43,146 | $ — | $ 43,146 | |
| Income tax payments | 234,455 | — | 234,455 | |
| Declared dividends on common stock | 92,505 | — | 92,505 | |

## AMTRUST FINANCIAL SERVICES, INC. AND SUBSIDIARIES

### NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
### (In Thousands, Except Per Share Data)

| | Consolidated Balance Sheet | | | |
|---|---|---|---|---|
| | December 31, 2014 | | | |
| **ASSETS** | **As previously reported** | **Adjustments** | **As restated** | **Reference** |
| | | (in thousands) | | |
| Investments: | | | | |
| Fixed maturities, available-for-sale, at fair value (amortized cost $4,137,146) | $ 4,253,274 | $ (3,275) | $ 4,249,999 | 4 |
| Equity securities, available-for-sale, at fair value (cost $84,075) | 81,044 | — | 81,044 | |
| Equity securities, trading, at fair value (cost $25,407) | 26,749 | — | 26,749 | |
| Short-term investments | 63,916 | — | 63,916 | |
| Equity investment in unconsolidated subsidiaries – related parties | 119,712 | — | 119,712 | |
| Other investments (related party $0) | 31,186 | 8,366 | 39,552 | 8 |
| **Total investments** | 4,575,881 | 5,091 | 4,580,972 | |
| Cash and cash equivalents | 902,750 | (21,851) | 880,899 | 1, 2, 4 – 9 |
| Restricted cash and cash equivalents | 186,225 | — | 186,225 | |

| | | | | |
|---|--:|--:|--:|---|
| Accrued interest and dividends | 42,173 | — | 42,173 | |
| Premiums receivable, net | 1,851,682 | 40,324 | 1,892,006 | 8, 9 |
| Reinsurance recoverable (related party $1,517,499) | 2,440,627 | 95 | 2,440,722 | 8 |
| Prepaid reinsurance premium (related party $918,505) | 1,302,848 | — | 1,302,848 | |
| Other assets (related party $136,516; recorded at fair value $264,517) | 1,083,034 | 7,841 | 1,090,875 | 1, 5, 8, 9 |
| Deferred policy acquisition costs | 628,383 | 878 | 629,261 | 3, 8 |
| Property and equipment, net | 154,175 | (9,067) | 145,108 | 5 |
| Goodwill | 352,685 | — | 352,685 | |
| Intangible assets | 314,996 | — | 314,996 | |
| | $ 13,835,459 | $ 23,311 | $ 13,858,770 | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| **Liabilities:** | | | | |
| Loss and loss adjustment expense reserves | $ 5,664,205 | $ — | $ 5,664,205 | |
| Unearned premiums | 3,447,203 | 2,332 | 3,449,535 | 8 |
| Ceded reinsurance premiums payable (related party $410,075) | 683,421 | — | 683,421 | |
| Reinsurance payable on paid losses | 3,947 | — | 3,947 | |
| Funds held under reinsurance treaties | 10,653 | — | 10,653 | |
| Note payable on collateral loan – related party | 167,975 | — | 167,975 | |
| Securities sold but not yet purchased, at fair value | 13,052 | — | 13,052 | |
| Securities sold under agreements to repurchase, at contract value | — | — | — | |
| Accrued expenses and other liabilities (recorded at fair value $60,271) | 795,877 | 209,495 | 1,005,372 | 1, 2, 4, 8, 9 |
| Deferred income taxes | 106,363 | (63,709) | 42,654 | 1, 2, 8 |
| Debt (net of debt issuance cost of $13,665) | 745,962 | — | 745,962 | |
| **Total liabilities** | 11,638,658 | 148,118 | 11,786,776 | |
| **Commitments and contingencies** | | | | |
| **Redeemable non-controlling interest** | 600 | — | 600 | |
| **Stockholders' equity:** | | | | |
| Common stock, $0.01 par value; 300,000 shares authorized, 196,422 issued; 155,478 outstanding | 1,960 | — | 1,960 | |
| Preferred stock, $0.01 par value; 10,000 shares authorized, 4,785 issued and outstanding; Aggregated liquidation preference $300,000 | 300,000 | — | 300,000 | |
| Additional paid-in capital | 1,021,789 | — | 1,021,789 | |
| Treasury stock at cost; 40,944 shares | (297,586) | — | (297,586) | |
| Accumulated other comprehensive income (loss) | 56,123 | 4,454 | 60,577 | 4, 8 |
| Retained earnings | 954,734 | (129,261) | 825,473 | 1, 2, 4, 5, 8 |
| **Total AmTrust Financial Services, Inc. equity** | 2,037,020 | (124,807) | 1,912,213 | |
| **Non-controlling interest** | 159,181 | — | 159,181 | |
| **Total stockholders' equity** | 2,196,201 | (124,807) | 2,071,394 | |
| | $ 13,835,459 | $ 23,311 | $ 13,858,770 | |

**AMTRUST FINANCIAL SERVICES, INC. AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(In Thousands, Except Per Share Data)**

**Consolidated Statement of Income**

| | Year Ended December 31, 2014 | | | |
| --- | --- | --- | --- | --- |
| | As previously reported | Adjustments | As restated | Reference |
| | (in thousands, except per share) | | | |
| **Revenues:** | | | | |
| Premium income: | | | | |
| Net written premium | $ 3,956,618 | $ (15,398) | $ 3,941,220 | 8 |
| Change in unearned premium | (430,054) | (4,332) | (434,386) | 8 |
| **Net earned premium** | 3,526,564 | (19,730) | 3,506,834 | |
| Service and fee income (related parties - $58,428) | 409,743 | (44,387) | 365,356 | 1 |
| Net investment income | 131,601 | — | 131,601 | |
| Net realized gain on investments | 16,423 | — | 16,423 | |
| **Total revenues** | 4,084,331 | (64,117) | 4,020,214 | |
| **Expenses:** | | | | |
| Loss and loss adjustment expense | 2,342,619 | (11,294) | 2,331,325 | 8 |
| Acquisition costs and other underwriting expenses (net of ceding commission - related party - $405,071) | 856,923 | 13,779 | 870,702 | 2, 8 |
| Other | 436,350 | (13,822) | 422,528 | 1, 8 |
| **Total expenses** | 3,635,892 | (11,337) | 3,624,555 | |
| **come before other (expense) income, provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest** | 448,439 | (52,780) | 395,659 | |
| **Other (expenses) income:** | | | | |
| Interest expense (net of interest income - related party - $2,601) | (45,857) | — | (45,857) | |
| Loss on extinguishment of debt | (9,831) | — | (9,831) | |
| uin on investment in life settlement contracts net of profit commission | 12,306 | — | 12,306 | |
| Foreign currency (loss) gain | 60,245 | (3,873) | 56,372 | 4, 8 |
| Gain of sale of subsidiary | 6,631 | — | 6,631 | |
| **Total other (expenses) income** | 23,494 | (3,873) | 19,621 | |
| **come before income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest** | 471,933 | (56,653) | 415,280 | |
| **Provision for income taxes** | 53,686 | (25,319) | 28,367 | 1, 2, 4, 5, 8 |
| **Income before equity in earnings of unconsolidated subsidiaries** | 418,247 | (31,334) | 386,913 | |
| **uity in earnings of unconsolidated subsidiary – (related parties)** | 28,351 | — | 28,351 | |
| **Net income** | 446,598 | (31,334) | 415,264 | |
| Net (income) loss attributable to non-controlling interests and redeemable non-controlling interests of subsidiaries | 416 | — | 416 | |
| **Net income attributable to AmTrust stockholders** | $ 447,014 | $ (31,334) | $ 415,680 | |
| Dividends on preferred stock | (12,738) | — | (12,738) | |
| **Net income attributable to AmTrust common stockholders** | $ 434,276 | $ (31,334) | $ 402,942 | |
| **Earnings per common share:** | | | | |
| Basic earnings per share | $ 2.89 | $ (0.21) | $ 2.68 | |
| Diluted earnings per share | $ 2.72 | $ (0.19) | $ 2.53 | |
| **Dividends declared per common share** | $ 0.425 | $ — | $ 0.425 | |

| | | | |
|---|---|---|---|
| **Weighted average common shares outstanding - basic** | 149,866 | — | 149,866 |
| **Weighted average common shares outstanding - diluted** | 159,034 | — | 159,034 |

## AMTRUST FINANCIAL SERVICES, INC. AND SUBSIDIARIES

## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
### (In Thousands, Except Per Share Data)

| | Consolidated Statement of Comprehensive Income | | | |
|---|---|---|---|---|
| | Year Ended December 31, 2014 | | | |
| | As previously reported | Adjustments | As restated | Reference |
| | (in thousands) | | | |
| Net income | $    446,598 | $    (31,334) | $    415,264 | |
| **Other comprehensive (loss) income, net of tax:** | | | | |
| Foreign currency translation adjustments | (17,358) | (4,388) | (21,746) | 4 |
| Change in fair value of interest rate swap | 664 | — | 664 | |
| Minimum pension liability | (1,055) | — | (1,055) | |
| Unrealized (loss) gain on securities: | | | | |
| Gross unrealized holding (loss) gain | 133,775 | (1,085) | 132,690 | 8 |
| Less tax (benefit) expense | 46,821 | (381) | 46,440 | 8 |
| Net unrealized holding (loss) gain | 86,954 | (704) | 86,250 | |
| Reclassification adjustment for investment gain (loss) included in net income, net of tax: | | | | |
| Other-than-temporary impairment loss | — | — | — | |
| Other net realized (loss) gain on investments | (4,918) | — | (4,918) | |
| Reclassification adjustment for investment gain (loss) included in net income | (4,918) | — | (4,918) | |
| **Other comprehensive (loss) income, net of tax** | $    64,287 | $    (5,092) | $    59,195 | |
| **Comprehensive income** | 510,885 | (36,426) | 474,459 | |
| Less: Comprehensive income (loss) attributable to non-controlling and redeemable non-controlling interest | (416) | — | (416) | |
| **Comprehensive income attributable to AmTrust Financial Services, Inc.** | $    511,301 | $    (36,426) | $    474,875 | |

| | Consolidated Statement of Changes in Stockholders' Equity | | | |
|---|---|---|---|---|
| | Year Ended December 31, 2014 | | | |
| | As previously reported | Adjustments | As restated | Reference |
| | (in thousands) | | | |
| Common stock | $    1,960 | $    — | $    1,960 | |
| Preferred stock | 300,000 | — | 300,000 | |
| Additional paid-in capital | 1,021,789 | — | 1,021,789 | |
| Treasury Stock | (297,586) | — | (297,586) | |
| Accumulated other comprehensive income (loss) | 56,123 | 4,454 | 60,577 | 4 |
| Retained earnings | 954,734 | (129,261) | 825,473 | 1, 2, 4, 5, 8 |

|  |  |  |
|---|---|---|
| $ 2,037,020 | $ (124,807) | $ 1,912,213 |

## AMTRUST FINANCIAL SERVICES, INC. AND SUBSIDIARIES

### NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
### (In Thousands, Except Per Share Data)

**Consolidated Statements of Cash Flows**

| | **Year Ended December 31, 2014** | | | |
|---|---|---|---|---|
| | **As previously reported** | **Adjustments** | **As restated** | **Reference** |
| **Cash flows from operating activities:** | | (in thousands) | | |
| Net income | $ 446,598 | $ (31,334) | $ 415,264 | |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | | |
| Depreciation and amortization | 63,093 | (1,681) | 61,412 | 5 |
| Net amortization of bond premium or discount | 15,395 | — | 15,395 | |
| Equity earnings on investment in unconsolidated subsidiaries | (28,351) | — | (28,351) | |
| Gain on investment in life settlement contracts, net | (12,306) | — | (12,306) | |
| Realized gain on marketable securities | (24,463) | — | (24,463) | |
| Non-cash write-down of marketable securities | 8,039 | — | 8,039 | |
| Non-cash write-down of goodwill | 62,898 | — | 62,898 | |
| Discount on notes payable | 3,095 | — | 3,095 | |
| Stock based compensation | 19,114 | — | 19,114 | |
| Loss on extinguishment of debt | 9,831 | — | 9,831 | |
| Bad debt expense | 24,294 | — | 24,294 | |
| Foreign currency (gain) loss | (60,245) | 3,873 | (56,372) | 4 |
| Gain on sale of subsidiary | (6,631) | — | (6,631) | |
| Acquisition gain | — | — | — | |
| Dividend received from equity investment | 246 | — | 246 | |
| Changes in assets – (increase) decrease: | | | | |
| Premiums and notes receivable | (251,544) | (40,324) | (291,868) | 8, 9 |
| Reinsurance recoverable | (503,926) | (95) | (504,021) | 8 |
| Deferred policy acquisition costs, net | (159,979) | | (159,979) | |
| Prepaid reinsurance premiums | (291,544) | (878) | (292,422) | 8 |
| Prepaid expenses and other assets | (198,891) | 10,127 | (188,764) | 1, 8, 9 |
| Changes in liabilities – increase (decrease): | | | | |
| Reinsurance premium payable | 48,656 | — | 48,656 | |
| Loss and loss expense reserves | 1,219,993 | — | 1,219,993 | |
| Unearned premiums | 706,976 | 2,332 | 709,308 | 8 |
| Funds held under reinsurance treaties | (10,397) | — | (10,397) | |
| Accrued expenses and other current liabilities | 62,533 | 41,420 | 103,953 | 1, 2, 4, 8, 9 |
| **Net cash provided by operating activities** | 1,142,484 | (16,560) | 1,125,924 | |
| **Cash flows from investing activities:** | | | | |
| Purchases of fixed maturities, available-for-sale | (2,425,101) | 3,275 | (2,421,826) | 4 |

| | As previously reported | Adjustments | As restated | Reference |
|---|---|---|---|---|
| Purchases of equity securities, available-for-sale | (293,554) | — | (293,554) | |
| Purchases of equity securities, trading | (84,493) | — | (84,493) | |
| Purchases of other investments | (20,207) | (8,366) | (28,573) | 8 |
| Sales, maturities, paydowns of fixed maturities, available-for-sale | 1,749,897 | — | 1,749,897 | |
| Sales of equity securities, available-for-sale | 238,369 | — | 238,369 | |
| Sales of equity securities, trading | 78,974 | — | 78,974 | |
| Sales of other investments | 17,854 | — | 17,854 | |
| Net sales of short term investments | 50,286 | — | 50,286 | |
| Net sale of securities sold but not purchased | 13,052 | — | 13,052 | |
| Acquisition of life settlement contracts | (25,419) | — | (25,419) | |
| Receipt of life settlement contract proceeds | 10,035 | — | 10,035 | |
| Loan to ACP Re | (125,000) | — | (125,000) | |
| Acquisition of subsidiaries, net of cash obtained | (80,736) | — | (80,736) | |

**AMTRUST FINANCIAL SERVICES, INC. AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(In Thousands, Except Per Share Data)**

| | Consolidated Statements of Cash Flows | | | |
|---|---|---|---|---|
| | Year Ended December 31, 2014 | | | |
| | As previously reported | Adjustments | As restated | Reference |
|---|---|---|---|---|
| Sale of subsidiary | 20,059 | — | 20,059 | |
| Increase in restricted cash and cash equivalents, net | (85,786) | — | (85,786) | |
| Purchase of property and equipment | (77,172) | 4,025 | (73,147) | 5 |
| **Net cash used in investing activities** | (1,038,942) | (1,066) | (1,040,008) | |
| **Cash flows from financing activities:** | | | | |
| Revolving credit facility borrowings | 220,000 | — | 220,000 | |
| Revolving credit facility payments | (100,000) | — | (100,000) | |
| Repurchase agreements, net | (293,222) | — | (293,222) | |
| Secured loan agreement borrowings | 30,500 | — | 30,500 | |
| Secured loan agreement payments | (3,009) | — | (3,009) | |
| Promissory note payments | (10,695) | — | (10,695) | |
| 2055 Subordinated notes proceeds | — | — | — | |
| Convertible senior notes proceeds | 68,400 | — | 68,400 | |
| Convertible senior notes payments | — | — | — | |
| Financing fees | (5,188) | — | (5,188) | |
| Common share issuance | — | — | — | |
| Common share repurchase | (59,155) | — | (59,155) | |
| Preferred share issuance | 178,641 | — | 178,641 | |
| Contingent consideration payments | — | (4,225) | (4,225) | 6 |
| Non-controlling interest capital contributions (dividends) to consolidated subsidiaries, net | 18,223 | — | 18,223 | |
| Stock option exercise and other | 8,776 | — | 8,776 | |

| | | | | | | |
|---|---:|---|---:|---|---:|---|
| Dividends distributed on common stock | (55,599) | | — | | (55,599) | |
| Dividends distributed on preferred stock | (12,738) | | — | | (12,738) | |
| **Net cash provided by (used in) financing activities** | (15,066) | | (4,225) | | (19,291) | |
| **Effect of exchange rate changes on cash** | (15,748) | | | | (15,748) | |
| **Net increase in cash and cash equivalents** | 72,728 | | (21,851) | | 50,877 | |
| **Cash and cash equivalents, beginning year** | 830,022 | | — | | 830,022 | |
| **Cash and cash equivalents, end of year** | $ | 902,750 | $ | (21,851) | $ | 880,899 |
| **Supplemental Cash Flow Information** | | | | | | |
| Interest payments on debt | $ | 36,679 | $ | — | $ | 36,679 |
| Income tax payments | | 85,619 | | — | | 85,619 |
| Declared dividends on common stock | | 64,538 | | — | | 64,538 |

122.   On April 11, 2017, The Wall Street Journal revealed that an accountant at AmTrust's former accounting firm, BDO USA LLP, had worn a wire on behalf of the FBI and in cooperation with the SEC as a whistleblower and secretly recorded internal conversations in 2014 regarding AmTrust. The recordings were part of a continuing federal investigation into the company's accounting practices. A separate examination by the New York Department of Financial Services, a leading state regulator, is also reportedly underway.

123.   On this news, AmTrust stock fell further, by $3.57 per share, or about 19%, from the previous day's closing price of $18.87 to close at $15.30 per share on April 11.

124.   The 2017 Proxy stated that the Audit Committee dismissed BDO USA, LLP as its independent auditor on April 1, 2016.

125.   Several years prior, on February 8 2014, Barron's reported on the Company's problematic accounting.

126.   These reasons support the inference that throughout the Relevant Period the Company's management, the Board, and the Audit Committee knew about, and at least were on notice of, the fraud alleged herein.

127.   The statements referenced in ¶¶ 97-109 above were materially false and misleading because they misrepresented and failed to disclose material adverse facts pertaining

to the Company's business, operations, prospects, and legal compliance, which were known to the Individual Defendants or recklessly disregarded by them.  Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose that: (1) the Company had ineffective assessment of the risks associated with its financial reporting; (2) the Company had an insufficient complement of corporate accounting and corporate financial reporting resources within the organization; (3) the Company did not appropriately recognize a portion of its warranty contract revenue; (4) the Company incorrectly expensed bonuses in the year paid rather than the year accrued; and (5) the Company lacked effective internal controls over financial reporting. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

128.    The Individual Defendants breached their fiduciary duties by making and/or causing the Company to make the foregoing material misrepresentations and omissions. Additionally, in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.  Moreover, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced, rendering them personally liable to the Company for breaching their fiduciary duties.

## REPURCHASES

129.    After the April 11, 2017 Wall Street Journal article, the price per share of AmTrust stock fell to $15.30.  This price reflected the true price per share of AmTrust stock, had

the Individual Defendants not engaged in their schemes as outlined herein. Therefore, any repurchases by the Company should have been made valuing their common stock at $15.30.

130.    For the month ended March 31, 2016, the Individual Defendants caused the Company to repurchase 5,539 shares of its own common stock at an average price per share of approximately $24.96, for a total cost to the Company of approximately $138,253.

131.    Due to the artificial inflation of the Company's stock price caused by the misrepresentations alleged to have been made during the Relevant Period, which benefitted certain Individual Defendants who engaged in insider sales of Company stock, the Company paid on average $9.66 more than each such share was worth during the month ended March 31, 2016.

132.    Thus, the total over payment by the Company for its repurchases of its own stock during the month ended March 31, 2016 was approximately $53,507.

133.    During the three months ended June 30, 2016, the Individual Defendants caused the Company to repurchase 3,575,860 shares of its own common stock at an average price per share of approximately $25.09, for a total cost to the Company of approximately $77.7 million.

134.    Due to the artificial inflation of the Company's stock price caused by the misrepresentations alleged to have been made during the Relevant Period, which benefitted certain Individual Defendants who engaged in insider sales of Company stock, the Company paid on average $9.79 more than each such share was worth during the three months ended June 30, 2016.

135.    Thus, the total over payment by the Company for its repurchases of its own stock during the three months ended June 30, 2016 was over $35 million.

136.    During the three months ended September 30, 2016, the Individual Defendants caused the Company to repurchase 2,003,035 shares of its own common stock at an average price per share of approximately $24.38, for a total cost to the Company of approximately $48.8 million.

137.    Due to the artificial inflation of the Company's stock price caused by the misrepresentations alleged to have been made during the Relevant Period, which benefitted certain Individual Defendants who engaged in insider sales of Company stock, the Company paid on average $9.08 more than each such share was worth during the three months ended September 30, 2016.

138.    Thus, the total over payment by the Company for its repurchases of its own stock during the three months ended September 30, 2016 was over $18.1 million.

139.    Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by over $53.1 million.

## DAMAGES TO AMTRUST

140.    As a direct and proximate result of the Individual Defendants' conduct, Amtrust will lose and expend many millions of dollars.

141.    Such losses include over $53.1 million the Company overpaid when it repurchased its own common stock during the Relevant Period at artificially inflated prices.

142.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions filed against the Company, its Chairman and President-CEO, and its Executive Vice President-CFO, and associated with investigations by the FBI, SEC, and the New York Department of Financial Services, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

143.    Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

144.    As a direct and proximate result of the Individual Defendants' conduct, AmTrust has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

145.    Plaintiff brings this action derivatively and for the benefit of AmTrust to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of AmTrust, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violation of Section 14(A) of the Exchange Act, as well as the aiding and abetting thereof.

146.    AmTrust is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

147.    Plaintiff is, and has been since before the beginning of the Relevant Period, a shareholder of AmTrust.  Plaintiff will adequately and fairly represent the interests of AmTrust in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

148.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

149.    A pre-suit demand on the Board of AmTrust is futile and, therefore, excused.  At the time of filing of this action, the Board consists of the following seven Individual Defendants: Defendants Zyskind, Rivera, L. Karfunkel, G. Karfunkel, Gulkowitz, Fisch, and DeCarlo (collectively, the "Directors").  Plaintiff needs only to allege demand futility as to four of the seven directors that were on the Board at the time this action was commenced.

150.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while they simultaneously caused the Company to repurchase its own stock at artificially inflated prices and two of them engaged in insider transactions based on material non-public information, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

151.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein.   The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors.  While investors were duped into believing the fraud perpetrated by the Individual Defendants, three of the Individual Defendants, including two of the seven Directors, collectively sold over a million dollars worth of Company stock at artificially inflated prices based on inside material information and the Company repurchased its own stock at artificially inflated prices.  As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

152.    Additional reasons that demand on Defendant Zyskind is futile follow.  Defendant Zyskind was the Company's Chairman and CEO at all relevant times, and is thus, as the Company admits in the 2016 Proxy Statement, a non-independent director. Indeed, He received lavish compensation, including $13,942,205 in 2015.   Defendant Zyskind was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the foregoing SEC filings, all of which he signed.   His large Company stock holding, worth approximately $965.6 million before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible.  Defendant Zyskind is also part of the controlling shareholder group comprised of himself, L.Karfunkel, and G. Karfunkel that controls the Company via its collective ownership of 49% of the Company's voting power.  This controlling group dominated the Board during the Relevant Period.  He is thus not independent, and he is also beholden to the other members of the controlling group. Moreover, Defendant Zyskind is a defendant in the Securities Class Actions.  As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the schemes described herein, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets.   Defendant Zyskind is also involved in at least twenty-one separate related-party transactions involving AmTrust and other entities he is affiliated with or owns in part.  Furthermore, Defendant Zyskind is related to Defendants L. Karfunkel and G. Karfunkel, who are both likely to face liability for the schemes outlined herein.  For these reasons, too, Defendant Zyskind breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

153.    Additional reasons that demand on Defendant L. Karfunkel is futile follow. Defendant L. Karfunkel has served as a Company director since May 2016.   Per NASDAQ Marketplace Rule 4200(a) (15), Defendant L. Karfunkel is a non-independent director.   Her large Company stock holding, worth approximately $519.5 million before the fraud was exposed, reveals her interest in keeping the Company's stock price as high as possible.   Defendant L. Karfunkel is also part of the controlling shareholder group comprised of herself, Zyskind, and G. Karfunkel that controls the Company via its collective ownership of 49% of the Company's voting power.   This controlling group dominated the Board during the Relevant Period.   She is thus not independent, and she is also beholden to the other members of the controlling group.   As a trusted Company director, she conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the schemes described herein, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets.   Defendant L. Karfunkel is also involved in at least twenty-one separate related-party transactions involving AmTrust and other entities she is affiliated with or owns in part. Furthermore, Defendant L. Karfunkel is related to Defendants Zyskind and G. Karfunkel, who are both likely to face liability for the schemes outlined herein.   For these reasons, too, Defendant L. Karfunkel breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

154.    Additional reasons that demand on Defendant G. Karfunkel is futile follow. Defendant G. Karfunkel has served as a Company director since 1998.   As the Company admits in the 2016 Proxy Statement, Defendant G. Karfunkel is a non-independent director.   His large Company stock holding, worth approximately $840.1 million before the fraud was exposed,

reveals his interest in keeping the Company's stock price as high as possible.  Defendant G. Karfunkel is also part of the controlling shareholder group comprised of himself, L.Karfunkel, and Zyskind that controls the Company via its collective ownership of 49% of the Company's voting power.  This controlling group dominated the Board during the Relevant Period.  He is thus not independent, and he is also beholden to the other members of the controlling group.  As a trusted Company director, he conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the schemes described herein, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets.  Defendant G. Karfunkel is also involved in at least seven separate related-party transactions involving AmTrust and other entities he is affiliated with or owns in part. Furthermore, Defendant G. Karfunkel is related to Defendants Zyskind and L. Karfunkel, who are both likely to face liability for the schemes outlined herein.   For these reasons, too, Defendant G. Karfunkel breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

155.   Additional reasons that demand on Defendant Gulkowitz is futile follow. Defendant Gulkowitz has served as a Company director since 2006 and is Chair of the Audit Committee and a member of the Nominating and Corporate Governance Committee.  Defendant Gulkowitz's insider sales before the fraud was exposed, which yielded over $418,990 in proceeds, demonstrate his motive in facilitating and participating in the fraud.  He received lavish compensation, including $140,006 in 2015.  His large Company stock holding, worth approximately $2.8 million before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible.  As a long-time, trusted Company director, and Chair

of the Audit Committee and member of the Nominating and Corporate Governance Committee, he conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the schemes described herein, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets.   Moreover, Defendant Gulkowitz is beholden to Defendants Zyskind, L. Karfunkel, and G. Karfunkel, the controlling shareholders, who dominated the Board during the Relevant Period.   For these reasons, too, Defendant Gulkowitz breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

156.   Additional reasons that demand on Defendant DeCarlo is futile follow. Defendant DeCarlo has served as a Company director since 2006 and is the Chair of the Nominating and Corporate Governance Committee, the Chair of the Compensation Committee, and a member of the Audit Committee.   Defendant DeCarlo's insider sales before the fraud was exposed, which yielded over $565,267 in proceeds, demonstrate his motive in facilitating and participating in the fraud.   He received lavish compensation, including $258,339 in 2015.   His large Company stock holding, worth approximately $3.4 million before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible.   As a long-time, trusted Company director, and member of the Audit Committee and the Chair the Nominating and Corporate Governance Committee and the Compensation Committee, he conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the schemes described herein, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously

disregarded his duties to protect corporate assets.  Moreover, Defendant DeCarlo is beholden to Defendants Zyskind, L. Karfunkel, and G. Karfunkel, the controlling shareholders, who dominated the Board during the Relevant Period.  For these reasons, too, Defendant DeCarlo breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

157.   Additional reasons that demand on Defendant Rivera is futile follow.  Defendant Rivera has served as a Company director since August 2016.  Per the 2016 Proxy Statement, Defendant Rivera is eligible to receive lavish compensation of at least a pro rata amount of $100,000 for 2016.  As a trusted Company director, he conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the schemes described herein, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets.  Moreover, Defendant Rivera is beholden to Defendants Zyskind, L. Karfunkel, and G. Karfunkel, the controlling shareholders, who dominated the Board during the Relevant Period.  For these reasons, too, Defendant Rivera breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

158.   Additional reasons that demand on Defendant Fisch is futile follow.  Defendant Fisch has served as a Company director since 2010.  She received lavish compensation, including $130,006 in 2015.  Her large Company stock holding, worth approximately $1.8 million before the fraud was exposed, reveals her interest in keeping the Company's stock price as high as possible.  As a long-time, trusted Company director, and member of the Audit Committee, the Compensation Committee, and the Nominating and Corporate Governance

Committee, Defendant Fisch conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the schemes described herein, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets.  Moreover, Defendant Fisch is beholden to Defendants Zyskind, L. Karfunkel, and G. Karfunkel, the controlling shareholder group that dominated the Board during the Relevant Period.  For these reasons, too, Defendant Fisch breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

159.    Additional reasons that demand on the Board is futile follow.

160.    The Directors have longstanding business, personal, and familiar relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders.  The relationships between Directors Zyskind, L. Karfunkel, and G. Karfunkel are particularly strong as they are not only family but also common parties to several different transactions and business endeavors as outlined herein.  These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct.  Thus, demand upon the Directors would be futile.

161.    Defendants Zyskind, G. Karfunkel, and L. Karfunkel are incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action because they are directly interested in several related-party transactions as outlined herein.  Each of these three directors, who are members of the controlling shareholder group and who are interested and face a substantial likelihood of liability, receive substantial personal

benefits as a result of these transactions and would fear that the transactions could be cancelled in retaliation by the other members of the controlling group if they accept a demand on the Board to make claims against, *inter alia*, the other members of the controlling shareholder group. Thus, demand upon the Directors would be futile.

162.    Additionally, the demand in this case is excused because the Directors violated the Company's Code of Ethics. Two of the seven Directors engaged in egregious insider transactions while the stock price was inflated because of the false and misleading statements. Additionally, all of the seven Directors failed to ensure that "the Company's public communications give an honest and consistent picture of [its] operations." Because the Directors violated the Code of Ethics, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

163.    AmTrust has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for AmTrust any part of the damages AmTrust suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

164.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of

exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

165.    The acts complained of herein constitute violations of fiduciary duties owed by AmTrust's officers and directors, and these acts are incapable of ratification.

166.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of AmTrust.  If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion."  As a result, if the Directors were to sue themselves or certain of the officers of AmTrust, there would be no directors' and officers' insurance protection.  Accordingly, the Directors cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Directors is futile and, therefore, excused.

167.    If there is no directors' and officers' liability insurance, then the Directors will not cause AmTrust to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

168.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, certainly at least four of the Directors, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

**Against Individual Defendants for Violations of**
**Section 14(A) of the Securities Exchange Act of 1934**

169.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

170.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

171.    Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

172.    Under the direction and watch of the Directors, the 2016 Proxy Statement failed to disclose that (1) the Company had ineffective assessment of the risks associated with its financial reporting; (2) the Company had an insufficient complement of corporate accounting and corporate financial reporting resources within the organization; (3) the Company did not appropriately recognize a portion of its warranty contract revenue; (4) the Company incorrectly expensed bonuses in the year paid rather than the year accrued; and (5) the Company lacked effective internal controls over financial reporting.

173.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2016 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2016 Proxy Statement, including but not limited to, election of directors, approval of officer compensation, and appointment of an independent auditor.

174.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2016 Proxy Statement.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

175.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

176.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of AmTrust's business and affairs.

177.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

178.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of AmTrust.

179.    In breach of their fiduciary duties owed to AmTrust, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose that: (1) the Company had ineffective assessment of the risks associated with its financial reporting; (2) the Company had

an insufficient complement of corporate accounting and corporate financial reporting resources within the organization; (3) the Company did not appropriately recognize a portion of its warranty contract revenue; (4) the Company incorrectly expensed bonuses in the year paid rather than the year accrued; and (5) the Company lacked effective internal controls over financial reporting. The Individual Defendants also failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties. Additionally, three Individual Defendants engaged in lucrative insider sales while the price of the Company common stock was artificially inflated due to the false and misleading statements of material fact.

180.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

181.    In further breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company during the Relevant Period to repurchase over $125 million dollars worth of its own common stock at artificially inflated prices, such that it overpaid by more than $53 million.

182.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and omissions

were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of AmTrust's securities and disguising insider transactions.

183.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of AmTrust's securities and engaging in insider transactions.

184.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

185.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, AmTrust has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

186.    Plaintiff on behalf of AmTrust has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

187.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

188.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, AmTrust.

189.    The Individual Defendants either benefitted financially from the improper conduct and their engaging in lucrative insider transactions tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from AmTrust that was tied to the performance or artificially inflated valuation of AmTrust, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

190.    Plaintiff, as a shareholder and a representative of AmTrust, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

191.    Plaintiff on behalf of AmTrust has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Abuse of Control

192.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

193.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence AmTrust, for which they are legally responsible.

194.    As a direct and proximate result of the Individual Defendants' abuse of control, AmTrust has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, AmTrust has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

195.    Plaintiff on behalf of AmTrust has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement

196.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

197.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of AmTrust in a manner consistent with the operations of a publicly-held corporation.

198.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, AmTrust has sustained and will continue to sustain significant damages.

199.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

200.    Plaintiff, on behalf of AmTrust, has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

201.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

202.    The Individual Defendants caused the Company to purchase its own stock at artificially inflated prices and to pay themselves excessive salaries, bonuses, fees, and stock grants to the detriment of the shareholders and the Company.

203.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused AmTrust to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend

unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

204.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

205.    Plaintiff on behalf of AmTrust has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of AmTrust, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to AmTrust;

(c)    Determining and awarding to AmTrust the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing AmTrust and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect AmTrust and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2.  a provision to permit the shareholders of AmTrust to nominate at least four candidates for election to the board; and

3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding AmTrust restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.


Dated: April 19, 2017                    Respectfully submitted,

Of Counsel:                              **FARNAN LLP**

Timothy W. Brown                         /s/ Brian E. Farnan
**THE BROWN LAW FIRM, P.C.**             Brian E. Farnan (Bar No. 4089)
240 Townsend Square                      Michael J. Farnan (Bar No. 5165)
Oyster Bay, NY 11771                     919 N. Market St., 12th Floor
(516) 922-5427                           Wilmington, DE 19801
Fax: (516) 344-6204                      (302) 777-0300
tbrown@thebrownlawfirm.net               Fax: (302) 777-0301
                                         bfarnan@farnanlaw.com
                                         mfarnan@farnanlaw.com

                                         *Attorneys for Plaintiff*